[Civ. No. 48601. Second Dist., Div. Four. Feb. 17, 1978.]

GLADYS JINES et al., Plaintiffs and Respondents, v.
ABRAHAM R. ABARBANEL et al., Defendants and Appellants.

## COUNSEL

Dryden, Harrington & Swartz, Peter Abrahams, Bonne, Jones & Bridges, John B. Cobb, Magaram, Riskin, Wayne & Minikes and Morton Minikes for Defendants and Appellants.

Hassard, Bonnington, Rogers & Huber, David E. Willett and Robert E. Faussner as Amici Curiae on behalf of Defendants and Appellants.

Joel W. H. Kleinberg for Plaintiffs and Respondents.

## OPINION

FILES, P. J.—Defendants appeal from a judgment on a jury verdict rendered against them and from the order denying their motions for judgment notwithstanding the verdict in a medical malpractice case. Defendants Bernard A. Aran, M.D. (hereinafter defendant Aran) and Rose Medical Group, Inc.,[1] appeal also from an order after judgment on December 23, 1975, denying their motion to tax costs. Defendant A. R. Abarbanel, M.D. (hereinafter defendant Abarbanel) and Dr. A. R. Abarbanel Medical Corporation appeal also from the order filed January 9, 1976, granting plaintiffs' motion to amend the judgment. A third physician, Luther Hand, M.D., was a defendant but the jury returned a verdict in his favor.

The issues on appeal relate to (1) sufficiency of the evidence to support the verdict against each defendant; (2) claimed errors in jury instructions; (3) the denial of defendant Aran's motion to strike from the cost bill the witness fees claimed under Code of Civil Procedure section 998, subdivision (d); and (4) the propriety of a post judgment order joining Dr. Abarbanel's medical corporation as an additional judgment debtor.

### I Sufficiency of the evidence

■ In reviewing the sufficiency of the evidence we consider, as we must, that evidence most favorable to the verdict, including all inferences which the jury could reasonably have drawn from the evidence,

---

[1]Rose Medical Group, Inc., is the professional corporation through which Dr. Aran practices medicine. Its liability is derived solely from the liability of Dr. Aran.

and disregarding the conflicting evidence. (See *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

■ On February 11, 1972, plaintiff first saw Dr. Aran, a medical doctor engaged in general practice. He requested a consultation from Dr. Abarbanel, a board certified gynecologist, who recommended that Mrs. Jines have "a hysterectomy and combined anterior and posterior vaginal repair."

The surgery took place on February 22, 1972.

Defendants Abarbanel and Aran constituted the "surgical team" for this operation. In the course of their 10-year friendship, the doctors had worked together on various patients. As was their usual custom when defendant Aran made a surgical referral to defendant Abarbanel, defendant Abarbanel acted as the surgeon and defendant Aran acted as the assistant surgeon. Over the course of the many operations the doctors had performed together they had developed "a meeting of the minds" with respect to defendant Aran's "functions" in the operating room as defendant Abarbanel's assistant surgeon. As part of the assistance provided by Dr. Aran, he would on occasion point out some disease condition that he saw, and on occasion he would make a suggestion as to what might be done.

Upon surgically entering Mrs. Jines' abdominal cavity, the doctors encountered an unusual mass of tissue which contained "several entities" bound together by "dense adhesions." The large bowel was incorporated in this mass, as well as the left ovary and tube.

Dr. Abarbanel considered the possibility of carcinoma. He also considered that it might be "diverticulitis, previous walled off ruptures." After dissecting the mass "alongside of the bowel from the parametrium, from the uterus, from the tube and ovary, and from the left lateral pelvic wall," Dr. Abarbanel and Dr. Aran decided that a consultation with a general surgeon and a pathologist would be advisable.

Dr. Luther Hand, a general surgeon who happened to be nearby, came into the operating room. Dr. Seifert, a pathologist, entered also. The testimony as to what occurred at the time of this consultation was highly conflicting. Dr. Hand testified that he was in the operating room two or three minutes, that Dr. Abarbanel merely indicated the operative site and asked him what he thought the mass could be. Dr. Hand stated

that he didn't know, but that he "would consider diverticulosis or tumor." Dr. Abarbanel performed a "sliver biopsy" which was given to Dr. Seifert for study. Dr. Seifert reported that the mass was "fibroadipose tissue, post chronic inflammatory," and not malignant.

Dr. Abarbanel testified that he asked Dr. Hand whether he should simply withdraw from the intended hysterectomy, but Dr. Hand "felt that since it was an old walled-off thing, it was no longer active, it was like something that had happened and these were just scars that had been left over." Dr. Abarbanel stated that while Dr. Hand was present there was a discussion about the advisability of performing a colostomy on Mrs. Jines. Dr. Abarbanel testified that Dr. Hand expressed his opinion that a colostomy was not necessary, and that it was absolutely safe to go ahead with the intended procedures. Dr. Hand denied that there was any such conversation.

It is undisputed that at no time did Dr. Hand palpate any of Mrs. Jines' organs or touch any instrument. Both Dr. Aran and Dr. Abarbanel testified that they relied on Dr. Hand's advice as to whether a colostomy should be performed on Mrs. Jines. No colostomy was performed, and, after Dr. Hand left the operating room, Dr. Abarbanel proceeded with a "modified subtotal hysterectomy and excision of the left tube and ovary and tissues in the left parametrial area."

In the customary way that defendants Abarbanel and Aran worked as a team, after the surgery Dr. Aran took over as "the captain of the ship" with respect to Mrs. Jines' post-operative care.

On February 27, 1972, defendant Aran called in Dr. Arthur M. Kahn, a board certified general surgeon, to render a consultation. Dr. Kahn found Mrs. Jines was "very ill." She had a high fever, was not rational, and a foul-smelling pus that "smelled like waste material" was "oozing up out of her lower abdomen" through the surgical incision along with bubbles of gas.

Based on his examination of Mrs. Jines and upon his review of her hospital records, Dr. Kahn concluded that there was a leakage of waste matter from the colon.

To correct this, Dr. Kahn performed a colostomy on Mrs. Jines on February 27, 1972. After that date, Mrs. Jines remained in Dr. Kahn's care. During the next 16 months Mrs. Jines endured numerous subse-

quent surgical procedures to cure abscesses formed as a result of the extensive infection caused by the leakage from her colon. In the course of eight admissions Mrs. Jines spent 180 days in the hospital. The colostomy was eventually closed and the normal use of the colon restored in June 1973.

Dr. Kahn testified that the operation performed by defendants on February 22, 1972, fell below the standard of care in the community in the following respects: "at the completion of the operation, I think that, knowing the inherent dangers of operating around a diseased colon, with the disease diverticulitis, that most physicians operating in this area would be afraid of potential contamination due to the inadvertent transaction of diverticula, and consequently would take precautions to try to prevent infection, such as irrigating the abdominal cavity and the pelvic cavity immediately during the operation with copious quantities of water to maybe dilute the germs or bacteria that have leaked out. And also, I feel that a colostomy would be constructed right away, at that time, because of the severe danger of development of complications such as that that ensued. Q. And the construction of a colostomy would be an appropriate thing to do under the standard of care in this community? A. Yes."

Dr. Kahn also testified that, in his opinion, the use postoperatively of oral laxatives, enemas and a rectal tube in Mrs. Jines' case "fell below the standard of care that reasonably prudent physicians" in the community would use. He testified "that as a result of the operation performed on February 22, 1972, and the postoperative care, that these in total could account for the development of the original colocutaneous fistula, and all of the subsequent complications, necessitating all of the subsequent operations." It is undisputed that doctors Abarbanel and Aran ordered oral laxatives, enemas and a rectal tube as part of Mrs. Jines' postoperative care.

Assuming that defendants thought, as they testified, that they had Dr. Hand's advice to go ahead without a colostomy, that reliance also supported a finding of negligence. Dr. Floyd Parks, a board certified general surgeon, and Dr. Hand both testified that if a physician performing surgery were to rely on the opinion of a general surgeon with respect to an unknown mass when the general surgeon had not palpated the mass, his conduct in so relying would fall below the standard of care applicable in the community. It was undisputed that Dr. Hand did not palpate any of Mrs. Jines' body.

Defendant Abarbanel makes the argument that, as a gynecologist, he could not be expected "to make the diagnosis of acute diverticulitis." He emphasizes the difference between diverticulosis, which is an outpocketing of the intestine, not a disease as such, and acute diverticulitis, which is an inflamed condition, and chronic diverticulitis, which is characterized by scar tissue resulting from an earlier inflammation. Defendants point to the following testimony given by Dr. Kahn after he had described the hazards of cutting into the mass which defendants found in Mrs. Jines' abdomen:

"Q. Doctor, would a physician who does surgery in the pelvis, if he exercised ordinary skill and care, and possessed ordinary skill and knowledge possessed by physicians in our community who are of good reputation, would such a physician recognize diverticular disease? A. Yes. Q. And if he failed to recognize diverticular disease, would his care fall below the standard that I have just indicated? A. Yes."

Defendants' contention appears to be that "diverticular disease" in that question, meant a benign condition not requiring special precautions. The jury was not required to interpret it so. What Dr. Kahn was referring to was the condition existing in Mrs. Jines' pelvis, and the danger that cutting into the area of the adhesions could open tiny abscesses which could not be seen, but which would open communication to the inside of the colon.

Dr. Abarbanel testified that when he found the mass he considered it might be "diverticulitis, previous walled-off ruptures" and that "statistically the odds were that it was an old diverticulum which had possibly ruptured or which had developed a peritonitis within the capsule of the bowel and the fatty tissue had become localized and walled off . . . ."

Dr. Lieberman, a board certified internist, testified: "Yes. I reviewed the records, and according to Dr. Abarbanel's notes, there was a clear-cut inflammatory process in a mass, which, by definition—or at least my definition—is an abscess, and in his own words, he said there was a ruptured diverticulosis as the cause of it."

Defendant Aran also challenges the evidence in support of the judgment against him claiming that there "is no evidence that either his pre-operative, surgical, or post-operative care of Mrs. Jines in any way fell below the standards of care of reasonably prudent general practitioners in the community."

His contention is, in essence, that he was a mere assistant who had no responsibility for Dr. Abarbanel's procedures. The record supports the finding that he was more than that. Dr. Aran had referred Mrs. Jines to Dr. Abarbanel. Dr. Aran and Dr. Abarbanel described themselves as a team who had worked together in the past. The latter testified that "if something was found, if he happened to see it from his side of the table where I couldn't see it, we would check it out, discuss it, and decide what was best for the patient." Dr. Aran testified he and Dr. Abarbanel decided to call for a consultation with a general surgeon. Dr. Aran took part in the consultation with Dr. Hand and testified that he relied upon Dr. Hand's opinion that a colostomy was not necessary. Dr. Aran could not remember whether it was he or Dr. Abarbanel who asked Dr. Hand whether a colostomy should be done. Dr. Aran consulted with the pathologist about whether it was carcinoma.

The judgment does not rest, as Dr. Aran's counsel contends, upon some theory of vicarious liability for Dr. Abarbanel's conduct. From the evidence as a whole, the jury was entitled to infer that Dr. Aran assumed responsibility for and actively participated in the decisions made in the operating room.

The judgment against Dr. Aran is also supported by Dr. Kahn's testimony that the postoperative care, including the use of oral laxatives, enemas and rectal tubes "fell below the standard of care that reasonably prudent physicians" in the community would use. Dr. Abarbanel testified that Dr. Aran was "the captain of the ship" with respect to post-operative care.

Defendant Aran's counsel points to the testimony given by plaintiffs' witness, Dr. Kahn, as follows: "Q. Doctor, do you have any medical criticism of Dr. Aran between the period of February 20 and February 27, 1972? A. No."

Whether Dr. Kahn intended it as criticism or not, his testimony concerning the standards of care in the community in relation to what happened to Mrs. Jines does furnish support for the jury's finding of negligence on Dr. Aran's part. It does not appear from the record whether or not Dr. Kahn was aware of the extent to which Dr. Aran assumed responsibility for what occurred during the surgery and the five days immediately afterwards. The quoted answer did not eradicate the other evidence. It was only another bit of evidence for the jury to

consider, along with all of the other testimony which applied to the conduct of Dr. Aran.

The jury could reasonably conclude from the whole record that the negligence of both doctors contributed to the injuries suffered by plaintiff. (See *Duprey* v. *Shane,* 39 Cal.2d 781, 795 [249 P.2d 8]; *Valdez* v. *Percy,* 35 Cal.2d 338, 342 [217 P.2d 422].)

II *Claimed errors with respect to instructions*

■ Dr. Abarbanel claims that the trial court committed prejudicial error in refusing to give the following instruction which he had requested: "A physician is not liable for a mistake in diagnosis unless his mistake was due to a failure to exercise ordinary care, diligence and skill in making the diagnosis."

The instructions given by the trial court included BAJI instructions Nos. 6.00, 6.02 and 6.03 explaining the duty of a physician or surgeon to use ordinary care. These instructions furnished the standards by which the liability issue was to be decided. Defendants were not prejudiced by the court's refusal to give their special instruction directed to mistake in diagnosis. It was the function of counsel in argument, to point out wherein the defendants' diagnosis did or did not meet the standards delineated in the instructions which were given.

■ Defendant Aran contends that "[t]he trial court committed reversible error in refusing to instruct the jury that it must apportion any damage award among the defendants according to their respective fault." This argument is an untimely attempt to elicit a holding in this court that *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] has abolished the doctrine of joint and several liability of tortfeasors.[2] The failure of defendant Aran to request such an instruction in the trial court is enough to bar his raising the issue here. (See *Willden* v. *Washington Nat. Ins. Co.* (1976) 18 Cal.3d 631, 636 [135 Cal.Rptr. 69, 557 P.2d 501].) Even more compelling is the fact that defendant Aran requested the contrary instruction (BAJI No. 15.03) which the trial court gave, stating as follows: "If you find that plaintiff is entitled to recover against more than one defendant, you must return a verdict in a single sum against the defendants whom you find to be

[2]This subject has been treated by the Supreme Court in *American Motorcycle Association* v. *Superior Court,* 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], filed February 9, 1978, an opinion which is not yet final as of the date of the filing of our opinion.

liable." Defendant Aran is not entitled to challenge that instruction now. (See *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 50 [123 Cal.Rptr. 468, 539 P.2d 36].)

III *Denial of the motion to tax costs*

■ Plaintiffs submitted a memorandum of costs and disbursements which included a claim against defendants Aran and Rose Medical Group in the amount of $7,035 for expert witness fees paid to seven doctors. This claim was based upon subdivision (d) of Code of Civil Procedure section 998,[3] and was supported by a declaration that, prior to trial, plaintiffs had served a written offer to allow judgment as to defendants Aran and Rose Medical Group for $199,999, a sum less than the amount awarded to plaintiffs by the trial court's judgment, but the offer had not been accepted. Those defendants made a motion for an order taxing costs, striking the expert witness fees, upon the ground that "none of the above-mentioned doctors testified with regard to Dr. Aran in this case and that their testimony was solely directed against the co-defendants." The trial court denied that motion, thereby allowing the claimed expert witness fees to become a part of the judgment against defendants Aran and Rose Medical Group. Those defendants now contend that this ruling was an abuse of discretion.

Section 998, subdivision (d), does give the trial court discretion to allow or disallow the fees of expert witnesses. In deciding the present case, we need not consider what are the standards for or the limits of that discretion. Here we need only to point out that the reason given by these defendants as a basis of their motion was inapplicable.

Our review of the record satisfies us that all of the seven witnesses in question gave testimony relating either to the condition of the patient before, during or after the surgery, or the prevailing standard of professional care by which the defendants were to be judged. Although the witnesses did not speak of Dr. Aran specifically, the testimony served to establish the course of conduct which was the basis of the finding of joint liability, and the amount of damages to be recovered by plaintiffs. For example, although Dr. Kahn stated he had no criticism of Dr. Aran,

---

[3]Code of Civil Procedure, section 998, subdivision (d): "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment, the court in its discretion may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in the preparation of the case for trial by the plaintiff, in addition to plaintiff's costs."

Dr. Kahn's description of the patient's condition, and his explanation of the standard of care were an important part of the evidence supporting a judgment against both doctors. We cannot say the trial court abused its discretion in refusing to strike those items upon the ground presented to the trial court.

IV *The trial court's order amending the judgment*

The judgment on the jury verdict was entered on October 29, 1975. Defendant Abarbanel filed his notice of appeal from that judgment on December 26, 1975. On December 19, 1975, plaintiffs filed their notice of motion to amend the judgment by adding the name of "Dr. A. R. Abarbanel Medical Corporation" as a defendant and judgment debtor. Hearing was had on December 30, 1975, and the matter was taken under submission. Plaintiffs' motion was granted by the trial court on January 6 and a signed order was filed January 9, 1976, directing the clerk of the superior court to amend the judgment by adding Dr. A. R. Abarbanel Medical Corporation as a judgment debtor.

The notice of motion filed December 19, 1975, stated the motion was "made on the grounds that such amendment of the judgment will be in furtherance of justice and that the failure to add the professional corporation as a judgment debtor was inadvertent and excusable." The notice also stated the motion was "on the further ground that the amendment will designate the real name of the judgment debtor."

The motion was supported by records of the state Board of Medical Examiners showing that the corporation was registered as a medical corporation under section 2501 of the Business and Professions Code; that A. R. Abarbanel was its president, director and sole shareholder, and that he was rendering professional services as an employee of the corporation. It was also shown that the corporation had submitted a bill for the professional services to Mrs. Jines which are the subject matter of this action.

Plaintiffs' counsel told the superior court that neither Dr. Abarbanel nor the corporation had any insurance with which to satisfy the judgment.

We note that the plaintiffs' argument in support of the order seems to assume that by creating a professional corporation, Dr. Abarbanel is somehow able to insulate some of his earnings from the reach of his

judgment creditors. No explanation is given for that assumption, and we do not accept it as a proper reading of the law relating to creditor's remedies. On this appeal, the issue is not how Dr. Abarbanel, as a judgment debtor, may be required to apply whatever economic value there may be in his professional corporation to the satisfaction of the judgment against him. The issue here is whether the superior court had power to add the corporation as a party defendant and judgment debtor after the judgment had been entered and an appeal taken.

The order adding the corporation as a party defendant cannot be classified as the correction of a clerical error. The function of an order correcting clerical error " 'is merely to correct the record of the judgment and not to alter the judgment actually rendered.' " (*Estate of Careaga* (1964) 61 Cal.2d 471, 474 [39 Cal.Rptr. 215, 393 P.2d 415].) A judgment was properly sought and obtained against Dr. Abarbanel, as the surgeon who had damaged the plaintiffs. Neither the jury nor the trial court had any intention of awarding a judgment against the corporation at the time the judgment on the verdict was entered. The amendment to the judgment was sought and granted as a change of substance: to impose liability on a distinct entity not previously mentioned, and to grant relief not theretofore sought, considered or ordered.

Plaintiffs seek to justify this change by the statement made in the superior court's minute order of January 6, 1976, as follows: "Court finds that Dr. Abarbanel and his corporation are *alter egos,* that there is no distinction between them, that there is such a unity of interest and ownership between them that the separateness of the Defendant Abarbanel and his corporation does not exist, and that adherence to the fiction of separate existence would promote injustice. (*Thomson* v. *L. C. Roney & Co.,* 112 CA 2d 420 (1952))."

As the Supreme Court pointed out in *Minton* v. *Cavaney* (1961) 56 Cal.2d 576, 579 [15 Cal.Rptr. 641, 364 P.2d 473], "The figurative terminology 'alter ego' and 'disregard of the corporate entity' is generally used to refer to the various situations that are an abuse of the corporate privilege." There is no suggestion of any such abuse here. The simple fact is that the corporation is an employer and Dr. Abarbanel is its employee. A corporate employer is liable for torts committed by its employee in the course and scope of the employment. There is no need to invoke a Latin figure of speech to impose liability upon such a corporate employer. All that is required is for the plaintiffs to join the corporation as a party defendant prior to judgment, and plead and prove

the employment relationship. The separateness of the employer and employee need not be disregarded in order to do justice. There is no more injustice in plaintiffs' situation here than in any other case in which a plaintiff sues a negligent employee without joining the employer.

*Thomson* v. *L. C. Roney & Co., supra,* 112 Cal.App.2d 420, relied upon by plaintiff and by the superior court, does not support the amendment of the judgment in this case.

In *Thomson* the plaintiff commenced an action against L. C. Roney & Co. for recovery of money arising out of certain business transactions dating from July 1946. The record revealed that, prior to the commencement of the plaintiff's action, all shares of L. C. Roney, Inc., were acquired by the Southwestern Development Company. The officers and members of the board of directors of both corporations were substantially identical. Thereafter, all of the assets of Roney were sold to Southwestern who immediately filed a certificate that it was conducting a business under the fictitious name of L. C. Roney, Inc., and thereafter continued to operate the business so acquired from L. C. Roney, Inc., under that name as a division of its own operations.

Thomson, being unaware of the transfer of the business, brought action against Roney arising out of a transaction occurring before the transfer of the business. A certificate of election to dissolve Roney was filed after the action was brought but prior to judgment. Southwestern employed an attorney to defend the action in the Roney name, and eventually Thomson recovered a judgment against Roney. Later, when these facts were brought to the attention of the court, the court ordered the name of Southwestern added as a judgment debtor. In affirming that order the Court of Appeal stated: "The order here under consideration does not effect an enlargement of the original judgment nor is it a modification thereof to correct a supposed error of law. It is simply an amendment whose purpose is to designate the real name of the judgment debtor." (112 Cal.App.2d at p. 425.)

In the *Thomson* case there was, in fact, but one entity conducting business after Southwestern took over the business formerly conducted by Roney. The relief granted in *Thomson* was based upon that fact. (See the discussion of *Thomson* in *Motores De Mexicali* v. *Superior Court* (1958) 51 Cal.2d 172, 174 [331 P.2d 1] and *McRae* v. *Bates* (1961) 196 Cal.App.2d 510, 514 [16 Cal.Rptr. 565].)

Here Dr. Abarbanel and his professional corporation have been openly conducting themselves as employee and employer, as is permitted by the professional incorporation statutes. (See Corp. Code, § 13400 et seq.; Bus. & Prof. Code, § 2500 et seq.) Nothing was irregular, nothing was concealed. Plaintiffs' attorneys concede they were aware of the existence of the corporation before the case was tried.

There was no legal basis for the postjudgment order adding the corporation as a judgment debtor.

The judgment entered October 29, 1975, is affirmed. The order denying the motions for judgment notwithstanding the verdict is affirmed. The order denying the motion of defendants Aran and Rose Medical Group, Inc., to tax costs is affirmed. The order filed January 9, 1976, purporting to amend the judgment is reversed. No party shall recover costs on appeal.

Kingsley, J., and Jefferson (Bernard), J., concurred.

A petition for a rehearing was denied March 7, 1978, and the petition of appellants Aran and Rose Medical Group, Inc. for a hearing by the Supreme Court was denied April 13, 1978.