[S. F. No. 18614. In Bank. Oct. 24, 1952.]

IVA MAE DUPREY, Respondent, v. DOCTOR RAYMOND SHANE et al., Appellants.

Newell J. Hooey, Robert L. Lamb and Herbert Chamberlain for Appellants.

Paul I. Myers for Respondent.

Partridge & O'Connell and Wallace O'Connell, as Amici Curiae on behalf of Respondent.

THE COURT.—In this malpractice action defendants appeal from a judgment entered on a jury verdict in plaintiff's favor. Defendants' chief contention is that because plaintiff was an employee of defendants Shane at the time she was injured, she may not recover damages in this action at law but may only receive compensation in a proceeding before the Industrial Accident Commission under the workmen's compensation laws of this state. (See Lab. Code, § 3601.)[1] A hearing was granted by this court, after decision by the District Court of Appeal, First Appellate District, Division One, for the purpose of giving further study to the problems presented. After such study we have concluded that the opinion of the District Court of Appeal, prepared by Presiding Justice Peters, affirming the judgment, correctly treats and disposes of the issues involved, and it is therefore adopted as and for the opinion of this court. Such opinion (with appropriate deletions and addita as indicated) is as follows:

"[ ] The cast of characters involved in this legal drama are:

"Iva Mae Duprey, the plaintiff and respondent, employed as a practical nurse by The Shane Diagnostic Foundation;

"The Shane Diagnostic Foundation, a partnershp engaged in the practice of chiropractic, a defendant and appellant;

"Dr. Raymond Shane and his wife Helen, defendants and appellants, who are partners doing business under the name of The Shane Diagnostic Foundation;

"Dr. John J. Harrison, a defendant and appellant, who is a chiropractor employed by The Shane Diagnostic Foundation during the period here involved.

"This is a malpractice action brought by Duprey against The Shane Diagnostic Foundation, the two Shanes, and Dr. Harrison. The basic theory of the suit is that on December 8,

---

[1]Section 3601: "Where the conditions of compensation exist, the right to recover such compensation, pursuant to the provisions of this division is, except as provided in section 3706 [not here involved], the exclusive remedy against the employer for the injury or death."

1947, the [ ] [plaintiff] received injuries to her neck and body while working at her employment; that thereafter she was treated by her fellow employee Dr. Harrison, and by her employer, Dr. Shane; that such treatments were negligently administered, resulting in a new and further disability, for which damages are sought. The basic defense on this appeal is that the superior court had no jurisdiction of the [ ] [defendants], or of the subject matter of the action, because, so it is claimed, the injury arose in the course and scope of the employment, and the Industrial Accident Commission has exclusive jurisdiction. Admittedly, the commission has made an award to [ ] [plaintiff], and it is claimed that this award is res judicata of all of the issues in this action. The trial court overruled demurrers, objections to the introduction of evidence, motions for nonsuit and for a directed verdict and other motions, all raising this basic question of jurisdiction. The jury brought in a verdict for $19,572.40 against the [ ] [defendants] above named, judgment was entered on this verdict, and a motion for a new trial denied.

"On this appeal [ ] [defendants] make three basic contentions:

"(1) That the Industrial Accident Commission has exclusive jurisdiction over all of the injuries sustained by [ ] [plaintiff], and its decision is res judicata of all of the issues involved herein;

"(2) That, as a matter of law, the evidence is insufficient to sustain the judgment against Dr. Harrison. The other defendants do not urge the insufficiency of the evidence to show negligence;

"(3) That the judgment is demonstrably excessive in the amount of $2,351.81.

*"The Facts Most Favorable to [ ] [Plaintiff]*

"It was stipulated that Helen and Dr. Shane were partners doing business as The Shane Diagnostic Foundation; that Dr. Harrison was employed as a chiropractor by this partnership and was such during the week of December 8 to 15, 1947; that [ ] [plaintiff] was an employee of the partnership on December 8, 1947, and that she was paid her wages for the week of December 8th to the 15th, and tried to work during that period.

"On December 8, 1947, it is admitted that [ ] [plaintiff] was injured in an accident arising out of her employment. On that day, as a practical nurse and in the course and scope of

her duties, she was giving therapy to a patient. The patient, in moving around in the course of the treatment, started to roll off the treatment table. [ ] [Plaintiff], who was standing on the opposite side of the table from which the patient was falling, grabbed the patient in order to break the fall. The patient grabbed [ ] [plaintiff] by her hands and the lower part of her arms, and thus the patient was eased to the floor. The [ ] [plaintiff] was pulled across the table with a 'terrific yank' to her shoulder. No injury to her neck was then received, according to [ ] [plaintiff].

"A short time after this incident [ ] [plaintiff] began to suffer pain in her right arm and shoulder, and her head began to ache. She spoke to Dr. Harrison about her pains, and, according to her testimony, he told her that headaches were his specialty and to come into his office and he would fix it up. This all occurred on the afternoon of December 8th. Dr. Harrison gave her what is referred to as a 'Palmer adjustment,' that is, the application of pressure to the neck while the patient is reclining. [ ] [Plaintiff] testified that this treatment was suggested by Dr. Harrison and consented to by her, and that Dr. Harrison gave her this same treatment several times that afternoon, after asking [ ] [plaintiff] if she were better, and receiving a negative reply.

"Dr. Harrison's testimony is not very satisfactory. He stated that he gave [ ] [plaintiff] a treatment during the morning of December 8th, but he also testified that he 'palpated' her back, spine and neck after the accident, on 'some' afternoon, and made an examination. On this examination, he stated, he discovered an area of tenderness, normal spastic tissue found in cases of pain, and a soreness and stiffness of the cervical area. He testified that he did not then manipulate or adjust [ ] [plaintiff's] spine or neck, although he also testified that he 'manipulated her or adjusted her.' At any rate, it is admitted that Dr. Harrison did not then or thereafter have any X rays made, nor did he make a fluoroscopic examination.

"[ ] [plaintiff] testified that on December 9th, 10th, 11th and 12th Dr. Harrison gave her several chiropractic adjustments and manipulations each day, similar to the treatments of December 8th, that considerable pressure was applied each time, and that such treatments were very painful. Dr. Harrison could not remember giving [ ] [plaintiff] any treatments on these days. [ ] [Plaintiff] also testified that the pain increased with each adjustment, that a completely new pain de-

veloped in her neck, that she suffered terrible headaches, and that her head began to fall to one side. Other doctors in the office looked at her through a fluoroscope on December 12th, but no X rays were taken.

"[ ] [Plaintiff] testified that she was treated during part of this period by Dr. Shane. She testified that on December 10th, Dr. Shane gave her a 'quick cervical'—a twisting and jerking of the head in the effort to try and snap in anything out of place. Similar treatment was given to her by Dr. Shane on December 11th. No X rays were taken by Dr. Shane.

"Dr. Shane denied that he gave [ ] [plaintiff] any chiropractic treatments on the days here involved, but testified that he examined her cervical spine on December 12th, but did not then examine the back of her head or her right shoulder. It was his testimony that [ ] [plaintiff's] head was rigid but erect, and that he could not then make a good examination because of the pain. Dr. Harrison, too, claimed that the reason he had not treated [ ] [plaintiff] was because of the pain spasm then present. This, he contended, prevented him from ascertaining the nature of the difficulty, although at another place he testified that his examination revealed a 'subluxation of the fourth cervical vertebra,' which means that that vertebra was out of place. Dr. Harrison testified that such condition requires an adjustment, but that such cannot be done when there is spastic tissue present. Heat and other forms of therapy will relieve the spastic condition. X rays were not taken by him because he did not believe that the condition he found required them, and he had no cause to suspect a fracture.

"Dr. Shane, who was not particularly active in treating patients, testified that a vertebral fracture could be identified by palpation—finger pressure—but that to ascertain the type and degree, X rays would be necessary. He thought that it would be bad practice for a chiropractor to treat a fracture.

"By December 12th, according to [ ] [plaintiff], she could not hold up her head, the entire right side of her body was very painful, and she could hardly use her right arm or walk. On December 13th—a Saturday—she told several of the doctors at her place of employment that she could not stand the pain any longer and believed that X rays should be taken, and she had X rays taken that day. Her condition became worse over the week end, and on Monday, December 15th, she consulted a [ ] physician and surgeon, Dr. Karfiol. This

doctor took more X rays which showed a partial dislocation of the fourth cervical vertebra. He hospitalized [ ] [plaintiff] on December 18th and kept her in traction for about two weeks, which made the dislocation no longer visible.

"This physician testified that he applied traction rather than manipulation because he does not manipulate spines if there is an anatomical injury, that is, a disorder discoverable by X rays or touch, because manipulation in such cases could be dangerous and cause nerve injuries. Dr. Karfiol's diagnosis of a subluxation was confirmed by Dr. Williams, an X-ray specialist, called in by Dr. Karfiol. A Dr. Brown, physician, examined the X rays taken up to this point and could find no evidence of a dislocation.

"In February of 1948 [ ] [plaintiff] consulted Dr. Anderson. He hospitalized [ ] [plaintiff] for about six or seven weeks, applied a Thomas collar to her neck, later a steel brace, and gave her therapy treatments until early 1949. Dr. Anderson testified as to the subluxation of the vertebra. When asked if he had formed an opinion as to the probable cause of her condition, he replied that he had reported to an insurance company that it was his opinion that 'as a result of the above described injury, or, as is more likely, the vigorous manipulation subsequent to injury, the patient has a subluxation of her neck at the level of the cervical four on five.' As late as March of 1950 this doctor ascertained that [ ] [plaintiff's] posture was still poor, her right shoulder was carried considerably lower than the left, she leaned towards the left and her head was tilted in that direction, turning to the right was restricted 60 per cent, and the other side about 50 per cent. X rays taken at this time showed that the vertebrae were about normal. Dr. Anderson found no evidence of fracture. He was of the opinion that there was no causal relation between the original injury suffered on December 8, 1947, and the injury which she exhibited while he was caring for her, and he was further of the opinion that 'it is highly possible and probable that the conditions that were found . . . could have been caused by the manipulations described.' The doctor also gave it as his opinion that 'it seems probable that the partial dislocation occurred as a result of the manipulations,' and that the epidural bleeding and scarring of the spinal cord shown to exist could have been caused by the manipulations and adjustments of the spine. Counsel for [ ] [plaintiff] made a prolonged attempt to get an opinion from the doctor as to whether manipulation of the patient

under the circumstances was or was not bad practice, and the doctor finally stated that manipulation without further diagnosis was bad practice.

"A Dr. Garol, a physician and surgeon, examined [ ] [plaintiff] in March of 1950. After describing his method of examination and his findings, he concluded that there was extensive scarring of the spinal cord and that respondent had a fractured vertebra. He was definitely of the opinion that the accident of December 8, 1947, could not have caused the dislocation and fracture he later found.

"Some of this testimony was contradicted by testimony produced by [ ] [defendants], but that conflict was for the jury.

"[ ] [Plaintiff] applied for, and received, an award of compensation from the Industrial Accident Commission. The commission found that on December 8, 1947, [ ] [plaintiff] sustained injury arising out of and occurring in the course of her employment 'consisting of a cervical strain,' and that such injury had caused temporary total disability from December 12, 1947, to January 11, 1949, and an appropriate award was made for that period and thereafter 'until the termination of disability.'

## "The Jurisdictional Question

"The basic arguments of [ ] [defendants] are that the commission had exclusive jurisdiction over all the injuries incurred by [ ] [plaintiff], and that its decision is res judicata of the issues in this civil action. The question involved can be stated as follows: Where an employee of a doctor is injured in the course and scope of the employment, and the insured employer treats the industrial injury, and does so negligently, proximately causing a new and further injury and disability, may the employee sue the employer-doctor for malpractice, or has the commission exclusive jurisdiction? It is our conclusion that, when the employing doctor elected to treat the industrial injury, [ ] the doctor assumed the same responsibilities that any doctor would have assumed had he been called in on the case. As will be pointed out, such third party doctor can be sued for malpractice resulting in an aggravation of an industrial injury, or a new injury. It follows that the employer-doctor may be sued for malpractice when he elects to treat the industrial injury.

"There can be no doubt, of course, that, so far as the original injury of December 8, 1947, is concerned, the em-

ployer being insured, the remedy before the commission is 'the exclusive remedy against the employer for the injury.' (Lab. Code, § 3601; see, also, Lab. Code, § 3600; *Baugh* v. *Rogers* [1944], 24 Cal.2d 200 [148 P.2d 633, 152 A.L.R. 1043]; *Popejoy* v. *Hannon* (1951), 37 Cal.2d 159 [231 P.2d 484].) ■ It is also true that the finding of the commission that [ ] [plaintiff] suffered an injury on December 8, 1947, compensable under the Workmen's Compensation Act is res judicata on that issue as against the employer. (*Goodman Bros., Inc.* v. *Superior Court* [1942], 51 Cal.App.2d 297 [124 P.2d 644]; [*cf. Rideaux* v. *Torgrimson* (1939), 12 Cal.2d 633, 638 [86 P.2d 826]].) ■ It is equally true, and admitted by all here concerned, that, in tort cases generally, when a person is injured by a tortious act and this injury is aggravated by the negligence of the attending physician, such aggravation of the injury is within the scope of the risk created by the original tortious act. (*Dodds* v. *Stellar* [1947], 30 Cal.2d 496 [183 P.2d 658]; *Heaton* v. *Kerlan* [1946], 27 Cal.2d 716 [166 P.2d 857].) This rule applies to workmen's compensation cases. ■ Thus, it is clear that, where an employee is injured in an industrial accident, and this original injury is aggravated by the negligence of the attending physician, and the employee seeks recovery for the original injury and for the aggravation from his employer or from his insurance carrier, the Industrial Accident Commission has exclusive jurisdiction to determine this claim against the employer or his carrier. (*Smith* v. *Coleman* [1941], 46 Cal.App.2d 507 [116 P.2d 133].) As to these principles, there is no serious disagreement between the parties.

■ "It seems equally clear that, when an employee is injured in an industrial accident, and the attending physician retained by the insurance carrier is negligent and causes a new injury, the employee may not only sue the employer [or the carrier] before the commission, but may also sue the doctor for malpractice. The commission has no jurisdiction of that action against the doctor. This result is reached on the theory that a doctor in such cases is a 'person other than the employer' within the meaning of section 3852 of the Labor Code which provides, in part, as follows: 'The claim of an employee for compensation does not affect his claim or right of action for all damages proximately resulting from such injury or death against any person other than the employer.' The same section gives the employer the right to sue such third person for reimbursement for expenses incurred by him.

"The proper principle is stated as follows in Hanna 'Industrial Accident Commission Practice and Procedure' at page 103: 'The commission lacks jurisdiction over any action for damages by an employee against a physician on account of alleged malpractice in the treatment of an industrial injury. It may grant increased indemnity or additional treatment to the employee when necessitated by mal-treatment on the part of the attending physician, such increased benefits being a part of the employer's liability. But when the employee chooses to seek damages from the doctor directly, jurisdiction is vested in the civil courts, as it is in all actions for negligence.' (See, also, Horovitz 'Workmen's Compensation,' p. 141, and p. 351, fn. 83.)

"One of the first cases in this state so holding is *Smith* v. *Golden State Hospital* [1931], 111 Cal.App. 667 [296 P. 127]. That case not only directly held that an action lies in the civil courts against an attending physician by an employee injured by reason of the negligence of the insurance doctor in attending an industrial injury, but also suggested, by dicta, that the employee could not recover from the employer in a compensation case for such aggravation of the injury. As to the first point, which was the only point directly involved in the case, the appellate court, after a review of the authorities, stated (p. 672): 'That independent professions by the fact of business contact with the employer should be absolved of responsibility for mistake, avoidable or unjustified neglect resulting in secondary affliction, seems obnoxious to the purpose and spirit of such a statute. To so hold might induce industry to encourage quackery, and place a premium upon negligence, inefficiency and wanton disregard of the professional obligations of medical departments of industry, toward the artisan.' The rule of this case, insofar as it held that the injured employee may sue the attending doctor in a malpractice case, has been consistently approved and followed in this state. (*Cumming* v. *Auriemma* [1935], 7 Cal.App.2d 208, 210 [46 P.2d 209]; *Steiner* v. *Goodyear T. & R. Co.* [1931], 115 Cal.App. 162, 164 [300 P. 980]; *Fitzpatrick* v. *Fidelity & Casualty Co.* [1935], 7 Cal.2d 230, 234 [60 P.2d 276]; *Smith* v. *Coleman* [1941, *supra*], 46 Cal.App.2d 507, 513 [116 P.2d 133]; *Heaton* v. *Kerlan* [1946, *supra*], 27 Cal. 2d 716, 723 [166 P.2d 857].) There are cases in other states that have adopted a contrary view, but California has consistently followed the rule as stated. (For general annotations on the subject see 82 A.L.R. 932; 139 A.L.R. 1010.)

"It is true that in *Heaton* v. *Kerlan* [1946, *supra*], 27 Cal.2d 716 [166 P.2d 857], the dicta contained in the Golden State Hospital case to the effect that the employee could not recover against the insurance carrier in an action before the commission for the aggravation of the original industrial injury caused by malpractice of the attending physician was disapproved. The precise language of the court is (p. 721): 'Language in that case that negligence in the treatment of an injury is not within the scope of the risk created by the injury . . . is disapproved.' But the court expressly recognized, and its decision is predicated upon the theory, that the employee may sue the attending doctor for malpractice in a civil action—see discussion pp. 722-723. One of the cases several times expressly approved in the Heaton case is *Fitzpatrick* v. *Fidelity & Casualty Co.* [1935, *supra*], 7 Cal.2d 230 [60 P.2d 276], where at page 234 it is stated: 'It is well settled, of course, that a doctor is liable for his own acts and an award to an employee or his dependents against the employer or his insurance carrier does not raise a bar to an action against the doctor for negligence or malpractice.' (See, also, *Dodds* v. *Stellar* [1947, *supra*], 30 Cal.2d 496 [183 P.2d 658].)

"Thus, it must be accepted as established in this state that an employee injured in an industrial accident may recover in a civil suit against an insurance doctor who aggravates the original injury by negligent treatment, even though the employee has secured an award from the commission against the employer for injury.

"It is equally clear, of course, that, if an employee of a doctor goes to that doctor for treatment of a nonindustrial injury, and the doctor is guilty of negligence, the employee may sue his employer for malpractice. That is obvious, because, of course, the commission would have no jurisdiction of such an action.

"So far, the principles stated are reasonably clear. [ ] [Defendants] claim, however, that the rule that the employee injured in an industrial accident can sue the attending physician for malpractice only applies when the doctor is a third person, and has no application where the attending physician is also the employer. There seems to be no authority directly in point on this question, but on principle and logic it would seem that it should make no difference to the liability of the doctor for malpractice whether the attending doctor is the employer or an insurance doctor. This fact should

not affect the legal rights of the employee. Dr. Shane, it is true, was the employer of [ ] [plaintiff]. As an employer it was his duty to secure compensation for his employee. That he did. As an employer he was under no obligation [under the circumstances shown here] to treat [ ] [plaintiff] personally. Had he sent [ ] [plaintiff] to the insurance doctor and had that doctor been negligent in treating the industrial injury, that doctor would have been liable for malpractice. There seems to be no logical reason why the employer-doctor, when he undertakes to treat the industrial injury, should not be responsible in a civil action for his negligent acts in treating that injury. Once it is established that an action before the commission for the industrial injury is no bar to an action against the insurance doctor for malpractice, it would seem to follow that the employee does not lose his right to such an action simply because the employer who happens to be a doctor treats the injury. In such event, the employer-doctor is a 'person other than the employer' within the meaning of section 3852 of the Labor Code above quoted. In treating the injury Dr. Shane did not do so because of the employer-employee relationship, but did so as an attending doctor, and his relationship to [ ] [plaintiff] was that of doctor and patient.

■ "[ ] [Defendants] say that such a result can be reached only on the theory that Dr. Shane had a dual legal personality—that is, Dr. Shane the employer, and Dr. Shane the doctor, and contend that the law frowns upon the creation of such dual legal personalities, citing such cases as *Walker* v. *City & County of San Francisco* [1950], 97 Cal. App.2d 901 [219 P.2d 487], and *Park* v. *Union Mfg. Co.* [1941], 45 Cal.App.2d 401 [114 P.2d 373]. It is true that the law is opposed to the creation of a dual personality, where to do so is unrealistic and purely legalistic. But where, as here, it is perfectly apparent that the person involved—Dr. Shane—bore towards his employee two relationships—that of employer and that of a doctor—there should be no hesitancy in recognizing this fact as a fact. Such a conclusion, in this case, is in precise accord with the facts and is realistic and not legalistic. ■ We conclude, therefore, that an employee injured in an industrial accident may sue the attending physician for malpractice if the original injury is aggravated as a result of the doctor's negligence, and that such right exists whether the attending doctor is the insurance doctor or the employer.

[This conclusion finds support, by analogy, in *Baugh* v. *Rogers* (1944), *supra*, 24 Cal.2d 200. It was there held that the provisions of the Labor Code, although effectual as a defense to bar recovery by the employee from the employer (except, of course, for compensation through Industrial Accident Commission proceedings), did not operate to preclude recovery from the employer by the owner of a motor vehicle for liability imposed on the latter by section 402(a) of the Vehicle Code arising out of the employer's negligent operation of the motor vehicle to the damage of his employee. The facts were that the owner of the car permitted the plaintiff's employer to drive the vehicle; the employer negligently operated the car and injured his employee. The employee sued both her employer (the operator of the car) and the car's owner. This court distinguished the relationships of the parties and their liabilities in their respective capacities, and refused to give to the workmen's compensation proceedings or statute the effect either of barring liability of the owner of the car (imposed by Vehicle Code section 402(a)) in favor of the injured person or of barring recovery by the owner, under the law of bailments, from the negligent operator (who was the employer of the injured person). Here, as in *Baugh* v. *Rogers,* the court will not extend operation of the defensive provisions of the Workmen's Compensation Act to bar actions to recover for liabilities which, although they may be in some indirect way connected with an employer-employee relationship, do not arise out of, or depend upon it, and are not expressly included within the terms of the statute.]

██ "[ ] [Defendants] next argue that the award before the commission compensated [ ] [plaintiff] for the injuries she now asserts. This same argument was repudiated by the courts of this state in the many cases above cited holding that the injured employee has an action against the insurance doctor for malpractice. The issues in the commission case and the malpractice case, and the items of damage recoverable in each case, are [ ] different [ ].

### "*Liability of Dr. Harrison*

"Dr. Harrison was an employee of Dr. Shane. Most of his arguments are predicated on the theory that Dr. Shane, as employer, is not liable for malpractice and that he, as an employee of Shane, should not be liable. Independently of the liability of Dr. Shane, it is hard to see how Dr. Harrison is in any different position than the insurance company

doctor would have been had he been called in to treat [ ] [plaintiff]. [No question of respondeat superior is involved. Both doctors personally treated the plaintiff.]

 ''This [ ] [defendant] also argues that the evidence is insufficient, as a matter of law, to show negligence on the part of either Dr. Shane or himself. The evidence has already been reviewed. The evidence clearly supports the implied finding of the jury that [ ] [plaintiff] suffered a new and further injury by reason of treatments given to her by Drs. Shane and Harrison.

''Because the expert evidence is to the effect that these subsequent injuries were the result of the negligence of both Drs. Shane and Harrison, the latter contends that, because he, as an employee, is not responsible for the acts of Dr. Shane, [ ] [plaintiff has] failed to prove that his negligence was a proximate cause of the injury. Obviously, the jury must have found that Drs. Shane and Harrison were joint tort feasors. If they were joint tort feasors, both are liable for the full damage to [ ] [plaintiff], at least in the absence of evidence to show facts upon which an apportionment could have been made. The burden of producing such evidence was on the [ ] [defendants]. (*Summers* v. *Tice* [1948], 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91]; *Finnegan* v. *Royal Realty Co.* [1935], 35 Cal.2d 409 [218 P.2d 17].) None was here produced.

## ''Excessive Damages

''No point is made that the general verdict, as to amount, is not supported by the evidence. [ ] [Defendants] do, however, contend that the verdict is demonstrably excessive in the amount of $2,351.81.

''The verdict and judgment were for $19,572.40 against Dr. Shane, his wife, The Shane Diagnostic Foundation and Dr. Harrison. In addition to proof of general damage, [ ] [plaintiff] introduced into evidence, over objection, and pursuant to an amendment to her complaint pleading the amount of special damages, medical bills in the amount of $3,572.40. One bill was for $1,220.59, admittedly paid by [ ] [plaintiff], and concerning which there is no complaint, and another for $2,351.81 paid by the Industrial Indemnity Company, the compensation carrier for Dr. Shane. The trial court instructed the jury that it could consider both bills in any award it might make. In view of the odd amount of the judgment, it may be assumed that the jury included the $2,351.81

in its verdict. (*Nitta* v. *Haslam* [1934], 138 Cal.App. 736, 747 [33 P.2d 678].)

■ "The trial court was correct in instructing that this item could be included in the verdict. Although the Industrial Indemnity Company did not file an independent action against Dr. Shane for the proportion of the amounts paid by it due to the malpractice of Dr. Shane and Dr. Harrison, after judgment it did file a lien for over $6,200, and later amended this lien to an even larger figure. Included within this claim of lien is the $2,351.81 item here involved. Such a lien is provided for by section 3850 through section 3862 of the Labor Code (formerly § 26 of the Workmen's Compensation Act) and may be filed any time before satisfaction of judgment. (*Jacobsen* v. *Industrial Acc. Com.* [1931], 212 Cal. 440, 448 [299 P. 66]; *Dighton* v. *Martin* [1935], 4 Cal.App.2d 401, 403 [41 P.2d 197].) ■ It seems quite clear that, although as between the employee and his employer and carrier, the malpractice is compensable, insofar as the injury is due to malpractice and not due to the original industrial injury, the carrier can recover from the employer [who undertakes as a doctor to treat the employee] those portions of the amounts paid by it to the employee that are due to the malpractice. Certainly that would be true if the doctor guilty of malpractice were a third person (*Dodds* v. *Stellar* [1947, *supra*], 30 Cal.2d 496, 501 [183 P.2d 658]; *Heaton* v. *Kerlan* [1946, *supra*], 27 Cal.2d 716, [719] 720 [166 P.2d 857]), and no different result should follow when it is the employer who is charged with malpractice. [As already shown defendants are not charged with malpractice as the employer but solely in their other entirely separate capacity and relationship to the injured person.] The mere fact that it may be difficult to segregate the portion of the payments made by the carrier for the original injury from that portion due to the malpractice does not defeat the carrier's right to its lien. (*Jacobsen* v. *Industrial Acc. Com.* [1931, *supra*], 212 Cal. 440, 448 [299 P. 66].)

"This being so, the questioned item is clearly recoverable by the employee in this action. ■ Where the employee sues, and the carrier does not join in the action but seasonably files a lien, the employee may recover special damages common to both. [ ]." In such event those damages are subject to the lien established by the carrier. (See Lab. Code, §§ 3855, 3856; *Pacific I. Co.* v. *California Elec. Works, Ltd.* (1938), 29 Cal.App.2d 260, 269 [84 P.2d 313].)

The judgment is affirmed.