KNOUS, ADMX., APPELLANT, *v.*
RIDGE MACHINE COMPANY; DOEHLER-JARVIS DIVISION,
NATIONAL LEAD INDUSTRIES, INC., APPELLEE.

(No. L-78-176—Decided March 30, 1979.)

*Mr. Kenneth L. Mickel,* for appellant.

*Mr. Robert M. Anspach* and *Mr. Kevin H. Graham,* for appellee.

WILEY, J.   The appeal herein is from a judgment entered upon the motion of defendant Doehler-Jarvis Division, National Lead Industries, Inc. (hereinafter referred to as Doehler-Jarvis), for summary judgment whereby the plaintiff's complaint against Doehler-Jarvis was dismissed with prejudice at the plaintiff's costs. The complaint remains pending against defendant Ridge Machine Co., and the appeal herein is taken in compliance with Civ. R. 54(B).

On or about March 29, 1974, appellant's decedent, Jerry Knous, was employed as a die casting operator by Doehler-Jarvis. Pursuant to his employment, Mr. Knous was engaged in servicing a "Unit 22" die casting machine on the premises of Doehler-Jarvis when the machine was inadvertently activated, resulting in the death of Mr. Knous. The Unit 22 die casting machine was designed and assembled by Doehler-Jarvis. Most of the materials used in the machine were supplied by the defendant Ridge Machine Co., pursuant to the specifications submitted by Doehler-Jarvis. The principal business of Doehler-Jarvis was the production of die castings; the designing and assembling of the die casting machines (such as Unit 22) used in the production of die castings was auxiliary to this principal business.

Appellee, Doehler-Jarvis, claims that the provisions of the workers' compensation statutes of the state of Ohio preclude recovery by the appellant. Appellant argues that the Workers' Compensation Act does not bar a claim for additional relief by reason of the applicability of the "dual capacity" doctrine. Thus, the only issue presented is whether appellee, Doehler-Jarvis, was acting in a dual capacity with reference to appellant's decedent at the time of his death.

Appellant sets forth one assignment of error as follows:

"The Trial Court erred in granting Appellee's Motion for Summary Judgment as there was a material question of fact as to whether the employer occupied a second or dual capacity to Appellant, unrelated to and independent of the traditional obligations of employment."

As divisions (A), (B), and (C) of this assignment of error, appellant's brief states:

"(A) Appellee's design of die cast machines was a separate corporate function, substantially unrelated to its primary business of selling die casts.

"(B) The hazard causing the decedent's death was not peculiar to his employment, but is one faced by the general public.

"(C) The appellee was engaged in the sale of die cast machines."

Appellee, Doehler-Jarvis, acknowledges that the dual capacity doctrine has been recognized in the state of Ohio as indicated by this Sixth District Court of Appeals in the case of *Mercer* v. *Uniroyal, Inc.* (1976), 49 Ohio App. 2d 279, and by the Supreme Court of Ohio in the case of *Guy* v. *Arthur H. Thomas Co.* (1978), 55 Ohio St. 2d 183. Cf. *Delamotte* v. *Corporation* (1978), 64 Ohio App. 2d 159, wherein employee's remedy against employer was not limited to that provided by the Workers' Compensation Act where claim was founded upon the alleged fraud of employer in the matter of medical records of employer.

It is undisputed that the death of appellant's decedent arose out of work-related activity, that his employer, Doehler-Jarvis, has complied with all the provisions and requirements of the Workers' Compensation Act of the state of Ohio and that appellant's decedent, as well as all other employees of Doehler-Jarvis, was covered by said Act. Appellant herein made application and received payment from the Industrial Commission of Ohio for the claims arising out of Mr. Knous' death.

Unit 22 was assembled by Doehler-Jarvis at its Toledo Plant No. 2 in the years 1958 and 1959. This machine was not "marketed" and no machines matching Unit 22 were sold to any consumer. It is undisputed that Doehler-Jarvis is a division of National Lead Industries and, as indicated by the "closed record" on file herein, 28 machines were supplied by Doehler-Jarvis to 17 separate corporate entities for use in their plants, under certain conditions set out in written agreements between the corporate entities involved.

These agreements covered a period from October 1910 until 1952. (See Appendix.) The law of strict liability is bottomed

on the proposition that in modern civilization mass production of products for consumption by the general public is extant and that the manufacturer of such products, by placing them in the stream of commerce, warrants them to be safe. Prosser on Torts (4 Ed. 1971) 641-662, Sections 96-99. Under the facts of the case herein, this law of strict liability is not applicable. Upon consideration of the limited number of machines "sold" and/or "transferred," the restrictions in the agreements as to use and resale of the machines, the restrictions upon Doehler-Jarvis as to similar agreements with other companies, and considering all of the surrounding circumstances, we find that Doehler-Jarvis was not engaged in the sale of die casting machines to the general public. See Restatement of the Law of Torts 2d 347, 348, 350, Section 402A and Comment thereunder, particularly *a* and *f*.

As noted, Doehler-Jarvis was engaged primarily in the manufacture of die castings; the design and assembly of the units used in the production of the die castings was auxiliary to the principal business. The appellant asserts that it was not necessary that Doehler-Jarvis design and assemble its own units and, therefore, "the obligations arising from the design of die-cast units by Doehler-Jarvis and the duties arising from the employment of the decedent were different and unrelated." We disagree. There is *a direct relationship to the producing of die castings and producing a machine for that purpose.* An employer who manufactures or designs and assembles a machine for the use of its own employees in its own production operations is not subject to a manufacturer's liability when his own employee is injured while repairing or using that machine. *Shook* v. *Jacuzzi* (1976), 59 Cal. App. 3d 978, 129 Cal. Rptr. 496; *Douglas* v. *E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 137 Cal. Rptr. 797; *Rosales* v. *Verson Allsteel Press Co.* (1976), 41 Ill. App. 3d 787, 354 N.E. 2d 553; 2A Larson, Workmen's Compensation Law 14-112 to 14-117, Section 72.80 (1976).

It is noted that the factual situation herein is materially different from the factual situation in *Mercer, supra,* and *Guy, supra.* In *Mercer,* the employee truck driver, covered by workmens' compensation by Uniroyal, was injured when a tire, on the truck in which the employee was riding, allegedly blew out causing injury to the employee. The tire, incidentally,

was manufactured by defendant Uniroyal. The injured employee was not involved in any manner with the manufacturing process; the hazard to the employee did not arise out of the employment, but out of the hazard to which any member of the general public was subjected by reason of the defective tire. In *Guy,* an employee of a hospital contracted mercury poisoning, compensable under Ohio Workers' Compensation Act. In addition, the employee was held to have a claim against the hospital for malpractice in failing to diagnose her medical condition, resulting in aggravation of the original condition. Her claim against the hospital for malpractice was no different from that of any other member of the public claiming malpractice.

In *Guy, supra,* at page 187, reference was made to the case of *Duprey* v. *Shane* (1952), 39 Cal. 2d 781, 249 P. 2d 8, in which the facts were practically analogous to those in *Guy.* We quote from the Ohio Supreme Court's decision in *Guy, supra,* at pages 187-188, which includes a quote by the California Supreme Court in *Duprey:*

"***In holding the employer vulnerable to a common-law suit for malpractice, the court found the employer, in his role as a doctor, to be a 'person other than the employer,' *i.e.,* a third party. The court maintained, at page 793, that the holding of this case was justified by the unusual facts:

" 'It is true that the law is opposed to the creation of a dual personality, where to do so is unrealistic and purely legalistic. But where, as here, it is perfectly apparent that the person involved—Dr. Shane—bore towards his employee two relationships—that of employer and that of a doctor—there should be no hesitancy in recognizing this fact as fact. Such a conclusion, in this case, is in precise accord with the facts and is realistic and not legalistic.'

"It has been stated that the decisive test of dual-capacity is not with how separate the employer's second function is from the first, but whether the second function generates obligations unrelated to those flowing from the first, that of an employer. 2A Larson, *supra,* at 14-117.***"

Even if the employer in this case would be considered a manufacturer producing a product to be used by the general public, it does not necessarily follow that the employer's function as a manufacturer generates obligations to the employee

*unrelated* to those flowing from the function of an employer. The employee herein, when injured, was not operating the machine in conducting the principal business of the employer, to wit: producing die castings, but was engaged in the repairing of the machine. Thus, the employee was injured as a result of performing duties as an employee of the employer-manufacturer of the machine. Furthermore, the employee was subject to the hazards peculiar to his employment and to which a member of the general public was not subjected. Under these circumstances we find it would be unrealistic to create a dual personality; likewise, to extend the "dual personality doctrine" established in the state of Ohio under the facts of *Guy, supra,* and *Mercer, supra,* to the facts in the case herein would be "purely legalistic."

In California, many unsuccessful attempts have been made to expand the dual capacity doctrine, adopted in *Duprey, supra,* as evidenced by the following statement of the court in *Shook* v. *Jacuzzi, supra,* 59 Cal. App. 3d, at pages 979 to 980:

"This appeal represents but one more unsuccessful effort to evade the clear statutory provisions which make workers' compensation procedures the sole remedy of an employee against his employer in industrial injury cases.

"* * * *

"* * * Attempts to extend the rule of *Duprey* have been repeatedly rejected (e.g., *Hazelwerdt* v. *Industrial Indem. Exchange,* 157 Cal. App. 2d 759 [321 P. 2d 831]; *Deauville* v. *Hall,* 188 Cal. App. 2d 535 [10 Cal. Rptr. 511]; *Dixon* v. *Ford Motor Co.,* 53 Cal. App. 3d 499 [125 Cal. Rptr. 872]; *Williams* v. *State Compensation Ins. Fund,* 50 Cal. App. 3d 116, 120-121 [123 Cal. Rptr. 812] )."

In *Hazelwerdt* v. *Industrial Indemnity Exchange* (1958), 157 Cal. App. 2d 759, 321 P. 2d 831, the court determined that the holding in the *Duprey* case had no application to the case before the court. In *Hazelwerdt,* the claimant had been allowed workers' compensation, including rather continuous medical expenses, including treatment by a psychiatrist. The claimant asserted an additional claim against his employer's insurance carrier for the reason that the psychiatrist allegedly employed by the employer had negligently failed to diagnose and recommend further surgery to the claimant. A second claim was made that the psychiatrist and the employer's insurance car-

rier had entered into a conspiracy against the claimant whereby the defendant-employer had refused to furnish the claimant with the proper medical, hospital, surgical and psychiatric treatment and thereby compelled the plaintiff to employ the service of private physicians.

In *Deauville* v. *Hall* (1961), 188 Cal. App. 2d 535, 10 Cal. Rptr. 511, the District Court of Appeal held that a claim for damages for aggravation, allegedly due to the mistreatment by employer's first aid man, was within the exclusive jurisdiction of the Industrial Accident Commission, where it did not appear that the first aid man acted in a capacity separate and apart from that of the employer, or rendered other than lay service.

In the case of *Dixon* v. *Ford Motor Co.* (1975), 53 Cal. App. 3d 499, 125 Cal. Rptr. 872, the court held that the widow and minor children of a deceased employee would have as an *exclusive remedy* the workmens' compensation benefits, where the death of the employee allegedly arose from the negligent treatment or negligent advice given to the employee at the emergency first aid medical facility for the convenience and welfare of its employees, staffed by a nurse and an orderly. In addition to the separate claim against the employer, a claim was made to the Workmen's Compensation Appeals Board claiming that the employee had died as a result of repeated occupational stresses and strains and died of the progression of arterial sclerotic heart disease leading to a heart attack while working on the job. The court, in denying the additional claim against the employer, stated, at page 507, that *Duprey* v. *Shane, supra,* was "unauthoritative in the context of the case at bench."

In the case of *Williams* v. *State Compensation Ins. Fund* (1975), 50 Cal. App. 3d 116, 123 Cal. Rptr. 812, the court denied a claim of an employee based on the theory that the employer designed and manufactured a spraying machine and, therefore, was liable in a dual capacity role, where the spraying machine was created by the employer solely for the use of its own employees in its own production or service operations. The court, at page 121, in denying the claims stated: "The analogy to *Duprey* is faint and unpersuasive." In *Williams,* the court emphasized the fact that the complaint showed that the firm created the machine for use by its own employees in

its own production or service operations, stating, at page 121:

"* * * Many entrepreneurs build and supply appliances and equipment exclusively for use in their own plants or premises. That sort of activity is integral and auxiliary to the firm's principal manufacturing or production operation. To conjure a nonemployer doppelganger out of such auxiliary activity represents an *ad hoc* theory devised to avoid the statute. * * *"

Likewise, the attempt herein is expected to be only one of many efforts to expand the application of the dual capacity doctrine in Ohio. Each case must be examined on its own merits, keeping in mind the basic principles enunciated herein, to wit: If the hazard arose out of the status of the employee during his relationship to his employer, rather than a hazard to which the employee was subjected as a member of the general public, the dual capacity doctrine does not apply. On the other hand, if the hazard to the employee arose out of his status as a member of the general public, the fact that he, incidentally, is an employee of the one creating the hazard would not bar the application of the dual capacity doctrine.

We find to be applicable the statement made by the court in the case of *Douglas* v. *E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 113, 137 Cal. Rptr. 797:

"We limit the holding of this case to a defendant who engages in manufacturing for sale to the general public. A single or occasional disconnected act does not constitute engaging in such manufacturing. The defendant who designs or manufactures a product for his own use and subsequently does sell an extra one of the products to his neighbor or to a similar business is not thereby subjected to manufacturers' liability when his own employee is injured in using the retained product. On the other hand, manufacturers' liability clearly arises where plaintiff employee is injured in using a product designed and manufactured by his employer primarily for sale to the general public and only incidentally used in the defendant's other activities. In between these extremes, the matter must be resolved on the facts of the particular case. * * *"

In conclusion, upon the facts of this case, we find that the employee's injuries arose directly out of the employer-employee relationship, rather than from a user-manufacturer relationship; therefore, the dual capacity doctrine does not apply and the action against the employer herein is barred by the

application of the provisions of the Ohio Workers' Compensation Act.

The assignment of error, in all its branches, is found not well taken and the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROWN and CONNORS, JJ., concur.

WILEY, J., retired, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.

## APPENDIX

The first agreement in the "closed record" herein, dated *October 15, 1910,* an agreement between Herman H. Doehler and a Franz Tschurl of Vienna, Austria, refers to certain pressure die casting machines, which were described in Letters Patent of the United States No. 856,772 and No. 856,773, dated respectively the 11th day of June, 1907, and to the purchase of at least one machine on or before April 1, 1911. The agreement provided that Tschurl was to be the exclusive agent for selling and using such machines within the Austro-Hungarian Empire for a term of 14 years from the date of the agreement. Furthermore, the agreement provided that in the case that Tschurl would place an order for two additional machines on or before August 1, 1911, that the same exclusive rights would be given to Tschurl in the German Empire as are granted to the Austro-Hungarian Empire. (Presumably this agreement was disrupted by the First World War.) The agreement had further provisions relating to the exclusive right of Tschurl and the limitation upon Doehler to sell or dispose of any machine for use in the German Empire. The agreement had provisions granting exclusive rights to Tschurl and limitations upon Doehler to sell or dispose of any other machines for use in the German Empire. By agreement entered into on *April 12, 1918,* Doehler Die-Casting Co., a New York corporation, entered into a similar agreement with The Patent Casting Syndicate, Ltd., Company of London, England. This agreement provided that Doehler Die-Casting Co. would not sell any similar casting machines to anyone else within Great Britain or Ireland as long as The Patent Casting Syndicate, Ltd., did not resell the casting machine supplied to it by Doehler-Jarvis nor sell any casting machine of the general

character to anyone else. On *November 21, 1918,* a similar agreement was entered into with another English company. Thereafter, additional agreements were entered into between Doehler Die-Casting Co. and usually a single company in various countries as follows: *July 1, 1919,* Norway; *December 17, 1919,* and *June 14, 1922,* Canada; *January 14, 1920,* Italy; *November 7, 1919,* France; *November 19, 1919,* Switzerland; February 24, 1921, an extension of agreement pertaining to Italy into the Balkan States; *in 1923,* Germany; *in 1925,* Spain; and *in 1927,* England. All of these agreements provided for a cash consideration for the "sale" of one or several machines. Each of the agreements had similar restrictions as above noted as to the use of the machines and as to the prohibition against the sale of the machine.

An examination of the record herein indicates no agreements between the dates of 1927 and 1946. Agreements entered into between *January 31, 1946 and June 6, 1952,* were similar to the agreements above noted with the exception that the parties are not referred to as "vendor" and "vendee." Furthermore, no cash consideration was stated for the delivery of the machines by Doehler-Jarvis to the other parties in the agreement but the consideration was to be based upon a formula related to the production of die-castings from the use of the machines. In the agreements prior to 1946, a cash consideration for the "sale" was provided in various amounts ranging from $1,000 up to $50,000.

The dates of the agreements and the countries involved in the agreements between 1946 and 1952 inclusive were as follows: *January 31, 1946*—an English Corporation; *February 27, 1946*—a Canadian company; *September 5, 1946*—a Canadian company (this agreement was not really for delivery of any machine but was merely the granting of a license to produce a certain door latch); *June 26, 1950*—a company in Germany; *September 14, 1951*—a company in Mexico; *June 6, 1952*—a company in Australia. There is no record of any further agreements after the year 1952 and a reading of the agreements would indicate that all of such agreements have expired as of the date of the hearing herein. Furthermore, these last six agreements executed between the years 1946 and 1952 had further provisions to the effect that the cost of the machines to be delivered was to be at the cost thereof to

Doehler-Jarvis and the machines were not for resale. Furthermore, there were restrictions as to the disposition of the machines at the termination of the agreements. All of the agreements had restrictions as to the geographical area in which the machines were to be used and Doehler-Jarvis agreed that it would not enter into any similar agreements with others in the various countries involved. The revenues derived from the agreements constitute only a small portion of the gross revenue of Doehler-Jarvis; for example, in 1959 and 1960 the revenues were 1.4 percent and 2.1 percent, respectively, of the gross revenues.