[Civ. No. 28002. Fourth Dist., Div. One. Aug. 17, 1983.]

MICHAEL SIVA, Plaintiff and Respondent, v.
GENERAL TIRE & RUBBER COMPANY, INC.,
Defendant and Appellant.

COUNSEL

Jones & Mullen and Arthur W. Jones for Defendant and Appellant.

Paul Newberry for Plaintiff and Respondent.

OPINION

**WIENER, J.**—Michael Siva, an employee of General Tire Service Company (General),[1] was injured on the job. He successfully sued General on a manufacturer's strict liability theory. General appeals from the judgment entered on the jury verdict awarding him compensatory and punitive damages, principally attacking the court's ruling that workers' compensation was not Siva's exclusive remedy. General also argues strict liability does not apply and challenges the jury's punitive damages award. We hold the court ruled correctly on the legal issues presented and substantial evidence supports the punitive damages award. We therefore affirm the judgment.

*Factual and Procedural Background*

General operated a San Diego retail outlet for selling and servicing tires. Competition in the San Diego tire market was heavy and in 1977 a General sales representative agreed to recap a heavy equipment tire originally manufactured by Allstate Tire & Rubber Company for San Diego Equipment Rentals, Inc.[2]

---

[1]Siva sued both General Tire, Inc. and General Tire & Rubber Company, Inc., doing business as General Tire Service Company. For purposes of this appeal, we do not distinguish these entities.

[2]The jury found San Diego Equipment not liable for Siva's damages. Siva has not appealed and General's appeal raises no issues with respect to San Diego Equipment. The judgment in favor of San Diego Equipment is thus final. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 130, p. 4126.)

Because Allstate is not a party to this lawsuit we do not address any issues regarding its potential liability.

After receiving the tire in San Diego, General sent it to its Los Angeles plant to be recapped and retreaded. Both Siva's and General's experts testified the tire was inadequately recapped. General's specifications were the same as industry standards, which provided that a reinforcement repair of a damaged casing could not exceed 30 percent of the tire's ply rating.[3] This type of repair requires the worker to "skive out," in essence remove, the damaged portion of the tire and place a patch over it. Where the damage is more extensive, the tire must undergo a "sectional" repair, an internal patch. Only one sectional repair is permitted unless the customer is contacted, approves the additional repair and waives a price adjustment if the tire fails.

The tire here had two skive out repairs and a sectional repair. The first skive out improperly removed seven out of the tire's eight plies. (See fn. 3, *ante*.) Moreover, the patch used was only three and one-half inches in diameter, substantially less than the eight inches necessary for this repair. The sectional repair, within six inches of the reinforcement repair, violated both industry standards and General's specifications.

Several operators repaired the tire. One skived out the damage to the casing; another applied the patch after inspecting the skive out. Another General employee viewed all the work done by these two operators. A fourth operator performed the sectional repair. A plant foreman was always on the floor and the plant manager was frequently on the floor observing the plant's operation.

Plant manager Bannish issued cards to the foremen noting the repairs to be done on each tire and referring to each work station in the plant. General admitted in answers to written interrogatories that each tire was inspected before it was repaired and a written report of the inspection was made. Bannish, however, testified no written report was available and no reports were introduced at trial.

General returned the tire to San Diego Equipment in 1977 and it was placed on a skiploader. In April 1978, San Diego Equipment informed the General San Diego store the tire was running a little low on air.[4] Although the skiploader operator occasionally inflated low tires on the equipment, he did nothing to this tire. General promptly responded to the call from San Diego Equipment by sending Siva, an experienced operator, to service and repair the tire. Siva suffered serious permanent injuries when the tire exploded while he was inflating it.

---

[3] This tire was a twelve ply rated tire which contained an actual number of eight plies. The skive out could remove 30 percent of 12 plies, or 3.6 plies.

[4] San Diego Equipment dealt only with General's San Diego store.

After the accident, the tire was returned to General for a post mortem. Bannish conducted this inspection and "couldn't come up with anything." Nonetheless, the tire was sent to General's Akron, Ohio plant and placed on display for all retread plant managers as an example of improper quality control.

*Discussion*

I

General's primary contention squarely addresses the dual capacity doctrine,[5] asserting Siva's only remedy was workers' compensation. (See Lab. Code, §§ 3600, 3601.)[6] In our review which follows we must presume the judgment is correct and where the record is silent must make all reasonable inferences in its favor. (See 6 Witkin, Cal. Procedure, *supra,* Appeal, § 235, p. 4225.)

The dual capacity rationale was first enunciated by the state Supreme Court in *Duprey* v. *Shane* (1952) 39 Cal.2d 781 [249 P.2d 8].[7] In *Duprey* the nurse-employee was permitted to sue her chiropractor-employer after

---

[5]General's contention strict liability does not apply is belied by its concession in its brief and at oral argument the tire was defective. General's strict liability argument merely casts its dual capacity contention in another light. General does not say the extensive recapping and retreading repairs performed on this tire did not constitute manufacturing a "new" product.

[6]The Legislature altered the employee's right to pursue actions under the dual capacity doctrine by amending Labor Code section 3602. (Stats. 1982, ch. 922, § 6.) This section did not go into effect until January 1, 1983. (See Cal. Const., art. IV, § 8, subd. (c)(1).)

Section 3602 in pertinent part provides: "(a) Where the conditions of compensation set forth in Section 3600 concur, the right to recover such compensation is, except as specifically provided in this section and Sections 3706 and 4558, the sole and exclusive remedy of the employee or his or her dependents against the employer, and the fact that either the employee or the employer also occupied another or dual capacity prior to, or at the time of, the employee's industrial injury shall not permit the employee or his or her dependents to bring an action at law for damages against the employer." A discussion of the new workers' compensation law can be found in Walters, *Workers' Compensation* (1983) 3 Cal. Law. 40.

[7]The term "dual capacity" was first used in this context in *Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 628 [102 Cal.Rptr. 815, 498 P.2d 1063]. See also *Bell* v. *Industrial Vangas, Inc.* (1981) 30 Cal.3d 268, 273 [179 Cal.Rptr. 30, 637 P.2d 266]; *D'Angona* v. *County of Los Angeles* (1980) 27 Cal.3d 661, 663 [166 Cal.Rptr. 177, 613 P.2d 238]; *Johns-Manville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 476, fn. 10 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758]; *Nicewarner* v. *Kaiser Steel Corp.* (1983) 143 Cal.App.3d 31, 35-36 [191 Cal.Rptr. 522]; *Cervantes* v. *Great American Ins. Co.* (1983) 140 Cal.App.3d 763, 767 [189 Cal.Rptr. 761]; *Bonus-Bilt, Inc.* v. *United Grocers Ltd.* (1982) 136 Cal.App.3d 429, 434 [186 Cal.Rptr. 357]; *Royster* v. *Montanez* (1982) 134 Cal.App.3d 362, 368-369 [184 Cal.Rptr. 560]; *Moreno* v. *Leslie's Pool Mart* (1980) 110 Cal.App.3d 179, 181 [167 Cal.Rptr. 747, 9 A.L.R.4th 869]; *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 612 [163 Cal.Rptr. 477]; *Douglas* v. *E. & J. Gallo Winery* (1977) 69 Cal.App.3d 103, 107 [137 Cal.Rptr. 797]; *Shook* v. *Jacuzzi* (1976) 59 Cal.App.3d 978, 980 [129 Cal.Rptr. 496].

being negligently treated by him. Even though her original injuries were industrial, she could still sue Shane because in treating her Shane was acting as a doctor rather than as her employer. (*Id.*, at p. 793.)

The last, and what may be the final, state Supreme Court expression of the dual capacity doctrine (see fn. 6, *ante*) came in *Bell* v. *Industrial Vangas, Inc.*, *supra*, 30 Cal.3d 268. *Bell* held the employee of a company which manufactured flammable gas could pursue a strict liability tort action against his employer. Reversing a judgment after the trial court granted the employer's summary judgment motion, the *Bell* court concluded an employee alleging concurrent causes for the injury, one job related and the other focusing on the manufacturer's strict liability not to introduce defective products into the stream of commerce, was entitled to proceed in tort based on the strict liability cause of action. "[A] coincidental employment relationship will not shield an employer from a common law liability where the *concurrent* cause of the injury is attributable to the employer's separate and distinct relationship to the employee and which invokes a different set of obligations than the employer's duties to its employees." (*Id.*, at p. 282, italics supplied.)

*Bell* observed a manufacturer-employer would be liable to its employee for damages in tort where it manufactured and sold a defective product to the public even though an employee was injured. (*Id.*, at pp. 275-276; see also *Moreno* v. *Leslie's Pool Mart*, *supra*, 110 Cal.App.3d at p. 182; *Douglas* v. *E. & J. Gallo Winery*, *supra*, 69 Cal.App.3d at p. 107.) But where the employer manufactured an item solely for its own use, it would not be liable. (*Bell* v. *Industrial Vangas, Inc.*, *supra*, 30 Cal.3d at pp. 274-275; see also *Douglas* v. *E. & J. Gallo Winery*, *supra*, 69 Cal.App.3d at p. 107; *Shook* v. *Jacuzzi*, *supra*, 59 Cal.App.3d at p. 981; *Williams* v. *State Compensation Ins. Fund* (1975) 50 Cal.App.3d 116, 121 [123 Cal.Rptr. 812].) ▮ "[A] manufacturer will not escape liability to its employees for defective products where there would be liability to any other injured person. [Citation.]" (*Bell* v. *Industrial Vangas, Inc.*, *supra*, 30 Cal.3d at p. 278.)

General argues the touchstone of the dual capacity doctrine is use. Here, General asserts that since it is a manufacturer obligated to inspect its products for defects before those products enter the stream of commerce, an employee assigned to inspect is not properly characterized as a user. Simply stated General says Siva is not a foreseeable user because he was part of the General team assigned to inspect for repair defects. (See *Douglas* v. *E. & J. Gallo Winery*, *supra*, 69 Cal.App.3d 103.) In *Douglas* the court said "[t]he same gross inequity [which would result absent the dual capacity doctrine] would be present if common law liability were denied where an

employee buys an automobile manufactured by his employer which contains a hidden defect and, while driving the car in the course of his employment (*other than in the course of test driving the car while the defect is being repaired*), suffers injury as a result of that defect." (*Id.*, at p. 111, italics supplied.)

General's argument, however, is more properly directed to different facts than the case before us. This is not a case where Siva was employed to test tires in General's assembly plant before they entered the stream of commerce. Here, the evidence and inferences which can reasonably be drawn indicate the contrary. Siva's injuries were only coincidentally the result of his employment.

There was no evidence Siva knew the tire had been reconstructed by General. It was originally manufactured by another tire company and had no markings regarding any repairs. The jury could properly infer from this and from the fact General competed with other tire companies that General field operators like Siva service and repair many brands of tires. The jury could also reasonably infer San Diego Equipment might have called General to service a tire another company had repaired. Had a repair person from another company or a San Diego Equipment operator been injured while inflating this tire, without question he could sue General. The jury's verdict impliedly found Siva was not part of a General defect inspection team but rather was simply an employee of a retail service operation who worked on all types of tires.[8] Because there is substantial evidence to support this finding, we affirm the jury's verdict awarding Siva compensatory damages.

## II

■ A defendant may be liable for punitive damages when he is guilty of "oppression, fraud, or malice." (Civ. Code, § 3294.) "Malice" refers both to evil motive and to conduct evincing "'a conscious disregard of the probability that the actor's conduct will result in injury to others.'" (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 808 [174 Cal.Rptr. 348].) ■ Punitive damages may be awarded in a products liability case. (*Id.*, at pp. 808-809.)

---

[8]General directs us to *Adams* v. *Ford Motor Co.* (10th Cir. 1978) 573 F.2d 1182 and *Mapson* v. *Montgomery White Trucks, Inc.* (Ala. 1978) 357 So.2d 971 where the plaintiff-employees were not permitted to recover against their employers. In those cases, the employees were injured while repairing defective vehicles covered by warranties. *Connolly* v. *Hagi* (1963) 24 Conn.Supp. 198 [188 A.2d 884], however, reached a different result on similar facts. In light of *Bell* v. *Industrial Vangas, Inc., supra,* 30 Cal.3d 268 the reasoning of *Adams* and *Mapson* is not persuasive. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

■ A corporate employer will be liable for punitive damages based on an employee's conduct where a managing agent of the corporation had advance knowledge of the employee's unfitness and nonetheless employed him or where the managing agent ratified the employee's conduct. (See Civ. Code, § 3294.) ■ Regardless of his official title, a managing agent is an individual who has the discretion to act in ". . . a managerial capacity . . . [by] making decisions that will ultimately determine corporate policy." (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822-823 [169 Cal.Rptr. 691, 620 P.2d 141], app. dism. (1980) 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271].) ■ Ratification is a fact question and may be proved by circumstantial evidence. (*Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 691 [117 Cal.Rptr. 146], disapproved on another ground in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 822, fn. 5.)

■ Here, there is substantial evidence the operators' conduct evidenced a conscious disregard of the probability that their conduct would result in injury to others. One expert called the tire a "time bomb." The operator removed twice as many plies as were safe. He also placed a grossly insufficient patch over this damaged area. This skive out should have been a sectional repair. If it had been so repaired, General's written policy was that the second sectional repair could not have been made without a price adjustment from San Diego Equipment.

There was no evidence presented that the operators had the discretion to exceed General's written standards for repairs of this nature and accordingly the jury could not have found they were acting in a managerial capacity. There is, however, sufficient evidence to uphold the jury's verdict on the basis of corporate ratification of their conduct.

It is clear Bannish acted in a managerial capacity. (See *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 822.) The jury could reasonably infer from the conflict in Bannish's testimony and General's interrogatory responses that Bannish knew the extent of damage to the tire but failed to write an inspection tag. The jury then could have concluded that because at least two and possibly several other workers saw the extent of the repairs, there was an implicit local policy to disregard General's written standards. General demonstrated this tire to all its plant managers as an example of poor quality control. The jury could thus infer the Los Angeles plant disregarded the corporation's specifications. Where there are production errors followed by other serious errors in a setting which indicates the managers are simply not looking at the final product, a jury can properly find the managers have instituted a policy which tacitly approves the work done. The tacit approval of misconduct in the circumstances of this case constitutes ratification of it.

*Disposition*

Judgment affirmed.

Brown (Gerald), P. J., and Butler, J., concurred.