(No. 53353

MAX D. McCORMICK, Appellee, v. CATERPILLAR TRACTOR CO. *et al.* (Caterpillar Tractor Co., Appellant).

*Opinion filed June 26, 1981.*

Westervelt, Johnson, Nicoll & Keller, of Peoria (Wayne L. Hanold and Jeffrey W. Jackson, of counsel), for appellant.

Jerome Mirza, of Bloomington, for appellee.

Douglas B. Stevenson, of Rooks, Pitts, Fullagar & Poust, of Chicago, for *amicus curiae* Illinois Manufacturers' Association.

MR. JUSTICE WARD delivered the opinion of the court:

On January 16, 1976, Max McCormick injured his left foot during the course of his employment at the Caterpillar Tractor Company in Peoria. He was first treated at the plant by Dr. M. E. Godby, who was one of a number of licensed physicians employed by Caterpillar Tractor on a full-time basis. After concluding from an X-ray examination that McCormick's left foot was not fractured, Dr. Godby attributed the swelling and tenderness in the foot to a strain. He told the claimant to return to work and also instructed him to wrap the foot and apply ice to it. On February 9, McCormick returned to the main medical-treatment room of the company, where the foot was examined by Dr. L. B. Patalinghug, another physician employed by the respondent. The left foot was still swollen in the region of the second and third metatarsal bones, and Dr. Patalinghug prescribed whirlpool treatments and told McCormick to return to work.

One week later, he again returned to the treatment room, complaining of aggravated swelling in his foot, and was seen by Dr. M. T. Neu, another company physician. Dr. Neu was of the opinion that the slowness in healing was due to continued stress from walking and similar activities. He, nevertheless, directed the claimant to wrap his foot with an elastic bandage and return to duty.

The pain and swelling did not subside, and on February 23, McCormick returned to the main treatment room, where he was treated by Dr. Patalinghug. Upon detecting an increase in the skin temperature at the swollen portion of the left foot, she referred McCormick to Dr. Flaherty. His examination disclosed a stress fracture of the second and third metatarsal bones of the left foot. McCormick filed a claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*), and the Industrial Commission made an award in favor of McCormick for 25% permanent loss of use of his left foot.

Subsequent to the entry of this award, McCormick filed two lawsuits in the circuit court of McLean County, which were later consolidated. The suits named as defendants Caterpillar Tractor and Drs. Neu, Godby, and Patalinghug and alleged negligence in the diagnosis and treatment of McCormick's injury. The court allowed a motion to dismiss as to Caterpillar Tractor and Dr. Neu and granted a motion for summary judgment as to Drs. Godby and Patalinghug. The appellate court, with one judge dissenting (82 Ill. App. 3d 77), held that the exclusive-remedy provision of the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.5(a)) did not bar a common law suit in tort against Caterpillar Tractor. Citing this court's decision in *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, and *Duprey v. Shane* (1952), 39 Cal. 2d 781, 249 P.2d 8, the court held that by furnishing medical services to its employees directly rather than having them provided at outside facilities by private medical personnel, Caterpillar Tractor subjected itself to tort liability under the "dual capacity" doctrine. The court held, too, that the exclusive-remedy provision of the compensation act, as applied to co-employees, could not be "abrogated" by the doctrine, and it affirmed the dismissal of the suit against Drs. Neu, Godby, and Patalinghug. We granted Caterpillar Tractor's petition for leave to appeal.

73 Ill. 2d R. 315(a).

The question for us is whether an employee whose injury arose out of and in the course of employment is barred by the exclusive-remedy provision of the Workmen's Compensation Act from recovering damages in a negligence action against the employer-company for aggravated injuries sustained in medical treatment by employees of the same company.

The design underlying the Workmen's Compensation Act was that the cost of industrial injuries should be borne by industry and not by the injured employee or by the general public. Thus our act provides that if an employee's injury arises out of and in the course of employment it is compensable, and questions of negligence, contributory negligence, and assumption of risk are not to be considered. Balanced against the imposition of no-fault liability upon the employer are statutory limitations upon the amount of the employee's recovery, depending upon the character and the extent of the injury. As part of this "balancing," the Act further provides that the statutory remedies under it shall serve as the employee's exclusive remedy if he sustains a compensable injury.

Section 5(a) of the Act provides:

> "No common law or statutory right to recover damages from the employer, his insurer, his broker, any service organization retained by the employer, his insurer or his broker to provide safety service, advice or recommendations for the employer or the agents or employees of any of them for injury or death sustained by any employee *** other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or anyone otherwise entitled to recover damages for such injury." Ill. Rev. Stat. 1977, ch. 48, par. 138.5(a).

Section 11 of the Act states:

> "The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsi-

bility of any employer engaged in any of the enterprises or businesses enumerated in Section 3 of this Act, or of any employer who is not engaged in any such enterprises or businesses, but who has elected to provide and pay compensation for accidental injuries sustained by any employee arising out of and in the course of the employment according to the provisions of this Act, and whose election to continue under this Act, has not been nullified by any action of his employees as provided for in this Act." Ill. Rev. Stat. 1977, ch. 48, par. 138.11.

In relatively recent years an exception to the exclusive-remedy provision of the Workmen's Compensation Act has developed under what has come to be called the dual-capacity doctrine. Professor Larson, in his treatise on Workmen's Compensation Laws states: "Under this doctrine, an employer normally shielded from tort liability by the exclusive remedy principle may become liable in tort to his own employee if he occupies, in addition to his capacity as employer, a second capacity that confers on him obligations independent of those imposed on him as employer." (2A A. Larson, Workmen's Compensation sec. 72.80, at 14–112 (1976).) The doctrine of dual capacity was applied by this court in *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313.

Under the circumstances here the doctrine will not permit the plaintiff to maintain a negligence action against the employer. The decisive test to determine if the dual-capacity doctrine is invocable is not whether the second function or capacity of the employer is different and separate from the first. Rather, the test is whether the employer's conduct in the second role or capacity has generated obligations that are unrelated to those flowing from the company's or individual's first role as an employer. If the obligations are related, the doctrine is not applicable.

Our workmen's compensation act requires that an employer "provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical,

surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury." (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(a).) The respondent here, in providing medical services to its employees, was meeting a duty imposed upon it as an employer under the Workmen's Compensation Act. That it chose to provide the services directly rather than through physicians hired independently does not alter the fact that medical services were rendered in response to the Act in its capacity as an employer. Larson states that it is clear that dual capacity will not be found simply because an employer has a number of departments with separate functions and operations. 2A A. Larson, Workmen's Compensation sec. 72.80 (1976).

The majority of the appellate court panel in this case relied strongly on *Duprey v. Shane* (1952), 39 Cal. 2d 781, 249 P.2d 8. There the plaintiff was employed as a practical nurse at her employer's clinic and was injured in the handling of a patient. She was treated by her employer, Dr. Shane, a chiropractor, and another chiropractor employed by him. She later filed a personal injury suit against both chiropractors, whose treatments, she claimed, had aggravated her injury. The court held that her suit was not barred by the exclusive-remedy provision in California's workmen's compensation act. Upon first observing that a compensation award would not bar a personal injury suit against an independent physician engaged by an insurance company, the court stated: "[I]t would seem to follow that the employee does not lose his right to such an action simply because the employer who happens to be a doctor treats the injury. In such event, the employer-doctor is a 'person other than an employer' within the meaning of *** [the] Labor Code. *** In treating the injury Dr. Shane did not do so because of the employer-employee relationship, but did so as an attending doctor, and his

relationship to \*\*\* [plaintiff] was that of doctor and patient." (39 Cal. 2d 781, 793, 249 P.2d 8, 15.) Here Caterpillar Tractor provided treatment on the basis of the employer-employee relationship and not as a treating physician.

We would observe also that in *Dixon v. Ford Motor Co.* (1975), 53 Cal. App. 3d 499, 507, 125 Cal. Rptr. 872, 877, it was said that California courts, in decisions subsequent to *Duprey v. Shane,* refused to extend its doctrine to different factual contexts. The court cited a treatise on workmen's compensation laws in California to the effect that " 'The *Duprey* case represented a unique situation in which the employer was also a doctor. Subsequent attempts to extend its holding were unsuccessful.' "

The circumstances in *Dixon* strongly resemble those here. A widow brought a wrongful death action against the Ford Motor Company and two employees of its medical staff for what she claimed was negligent treatment of her husband in the employer's first-aid station, which she said caused her husband's death. The court held that the dual-capacity doctrine was inapplicable and that the exclusive remedy was under the workmen's compensation statute. Among the cases cited by the court was *Deauville v. Hall* (1961), 188 Cal. App. 2d 535, 10 Cal. Rptr. 511. There, where an employer had furnished medical treatment to an injured employee, it was claimed that the employee should be permitted to file an independent action where his original compensable injury "was aggravated by the carelessness of an unqualified doctor" and that the negligence of other medical personnel in diagnosing the employee's injury "[gave the employer] a status separate and apart from that of the employer \*\*\*." (188 Cal. App. 2d 535, 540, 10 Cal. Rptr. 511, 514.) The court rejected this argument and, in holding that the workmen's compensation act provided the claimant's exclusive remedy, stated that "there is nothing in the Act or the authorities to warrant

an action in a court of law against an employer for the latter's negligence in providing *** medical treatment." 188 Cal. App. 2d 535, 540-41, 10 Cal. Rptr. 511, 514.

Also, in *Trotter v. Litton Systems, Inc.* (Miss. 1979), 370 So. 2d 244, the Supreme Court of Mississippi held that an employer could not be liable under the dual-capacity doctrine for the negligence of employees at its first-aid station in treating an employee's industrial injury. The court rejected the claim that under *Duprey* the plaintiff could recover and, in holding that the exclusive-remedy provision of the workmen's compensation statute precluded the plaintiff's recovery, cited *Dixon v. Ford Motor Co.* The court relied too on *Warwick v. Hudson Pulp & Paper Co.* (Fla. App. 1974), 303 So. 2d 701, in which the court refused to allow, under the dual-capacity doctrine, a recovery for the alleged negligence of staff nurses, employed by the company, who had treated the employee's industrial injury in the company's clinic.

For the reasons given, we hold that the Workmen's Compensation Act provided the sole means of recovery for the plaintiff's compensable industrial injury. That portion of the judgment of the appellate court which held that Caterpillar Tractor could be sued under the dual-capacity doctrine is reversed. Since no petition for leave to appeal was filed as to the appellate court's affirmance of the circuit court of McLean County's action dismissing the plaintiff's suits as to Drs. Neu, Godby, and Patalinghug, there is no question before us as to them.

*Appellate court affirmed in part and reversed in part; circuit court affirmed.*

MR. JUSTICE SIMON, dissenting:

I dissent because I take a view different from that of the majority of Caterpillar's role in the malpractice that aggravated McCormick's original injury. My appraisal is

that Caterpillar's conduct in employing doctors to provide medical services generated obligations other than those flowing from Caterpillar's role as McCormick's employer. I believe the dual-capacity exception to the exclusive-remedy provision of the Workmen's Compensation Act should apply.

It is significant to point out that when McCormick went to Caterpillar's doctors for treatment the relationship was entirely voluntary. Caterpillar and McCormick had an employment relationship; then, separately, McCormick and the doctors entered a patient-doctor relationship.

Caterpillar did not have to employ doctors of its own to treat McCormick. Its duty was only to make sure that adequate treatment was available; it could have brought in doctors as independent contractors, or referred McCormick to outside doctors.

> "The medical treatment of injuries is a separate and distinct function *** which does not concern the employer and is not part of the employer's business operations." (*Tropiano v. Travelers Insurance Co.* (1974), 455 Pa. 360, 363, 319 A.2d 426, 427.)

> "There is nothing in the Workmen's Compensation Act which requires a compensation carrier, any more than an employer, to maintain and operate a clinic. ***

> * * *

> [The defendant] would avoid the realities of the case. It was under no statutory or other obligation to run a clinic. Since it undertook to do so, it had the unquestioned duty of exercising reasonable care (the same standard as would be applicable to any other clinic or hospital facility) ***." *Mager v. United Hospitals* (1965), 88 N.J. Super. 421, 427-29, 212 A.2d 664, 667-68, *adopted by*

*supreme court* (1966), 46 N.J. 398, 217 A.2d 325.

More significantly, McCormick did not have to go to the Caterpillar clinic. Section 8(a) of the Workmen's Compensation Act allowed him to go to any doctor he chose, and to send Caterpillar the bill. Ill. Rev. Stat. 1975, ch. 48, par. 138.8(a).

There was no medical urgency; the injury could have been treated elsewhere. Even on McCormick's first visit, there was evidence that the injury was not treated for several hours. McCormick returned to the clinic at intervals for more than a month, working and generally getting around in the meanwhile.

Thus, the only reason McCormick was treated by Caterpillar doctors was that the employer chose to offer medical services through its own doctors and McCormick went to the company clinic for treatment. There was, of course, a doctor-patient relationship between the Caterpillar doctors and McCormick, just as between any doctor and patient. This relationship had to be voluntarily assumed by both sides; it did not just naturally grow out of the employment and the work-related injury.

The majority's cases may be distinguished along these lines. Under Mississippi (*Trotter v. Litton Systems, Inc.* (Miss. 1979), 370 So. 2d 244) and Florida (*Warwick v. Hudson Pulp & Paper Co.* (Fla. App. 1974), 303 So. 2d 701) law, as *Trotter* stresses, the employer has the right to choose the doctor; if the injured employee goes to his own, he pays his own bill. The connection between the doctor and the employer is therefore closer than is required in Illinois. (*Cf. Vesel v. Jardine Mining Co.* (1940), 110 Mont. 82, 104-05, 100 P.2d 75, 85 (distinguishing States that require the employer to furnish medical aid from Montana, which does not).) A close connection between medical treatment and employment may also be provided by medical urgency. If the employee is seriously

injured so that he requires immediate attention, he may have no chance to leave the employment setting, and the employer may have no chance to call in an outside doctor. First aid must be provided by someone who is always available, often probably an employee, and often not a doctor. When the victim's condition is aggravated because the person responsible for first aid does not realize the seriousness of the injury or sends him to an incompetent doctor (*Deauville v. Hall* (1961), 188 Cal. App. 2d 535, 10 Cal. Rptr. 511) or slouches at his desk, smoking and reading (*Collier v. Wagner Castings Co.* (1980), 81 Ill. 2d 229), the essence of the plaintiff's complaint is that the employer failed to provide necessary medical care—failed, that is, to discharge a duty imposed on it *as an employer,* by the Act. A stranger, even if a doctor, is not required to provide first aid or maintain a list of competent doctors. Here, in contrast, the complaint is that the employer breached a duty owed by every doctor to every patient, a duty imposed neither by the Act nor by the employment relationship, but assumed by Caterpillar when it decided to provide medical services.

McCormick's malpractice claim and his compensation claim are not only different legal theories, different ways of talking about the same claim. The malpractice claim is based on a second injury, a distinct event, an obviously separate nexus of facts. Caterpillar is liable for McCormick's aggravated injury in two ways: it is liable for the *original injury even as aggravated,* and it is liable for *aggravation.* Caterpillar was responsible, under the compensation act, for the effects of the initial work-related accident no matter how the first injuries might be aggravated, much as at common law the tortfeasor is responsible for all proximate results of the tort including aggravation by imperfect medical care. That responsibility did not depend on how the aggravation came about; Caterpillar would have been responsible if McCormick aggra-

vated his injuries by falling while getting out of bed (*G.H. Hammond Co. v. Industrial Com.* (1919), 288 Ill. 262) or stumbling on the street near his house (*Bailey v. Industrial Com.* (1919), 286 Ill. 623). But also, Caterpillar may be liable like anyone else if it actually causes the aggravation by its negligence, or its servants' negligence. Does the employer's immunity from a tort suit for the original accident carry over to its later conduct in aggravating the injury?

The frequently cited decision in *Duprey v. Shane* (1952), 39 Cal. 2d 781, 249 P.2d 8, holds that it may not. Because the first injury was work related does not mean that the aggravation, as such, is also work related. As one court said, in allowing a tort action against a compensation insurer:

> "The suggestion that runs through the insurer's argument *** is that what happened at the clinic was nothing more than a sequel to the original work-connected injury. [The defendant's] brief refers to the sequelae as an 'aggravation' of the original injury. This is merely another way of seeking the protection of the employer's liability, limited as it is to the schedules in [the act]." (*Mager v. United Hospitals* (1965), 88 N.J. Super. 421, 428, 212 A.2d 664, 668, *adopted by supreme court* (1966), 46 N.J. 398, 217 A.2d 325.)

Another court explained in allowing a tort action against an employer:

> "The injury complained of—death—is *not* alleged to have arisen out of and in the course of employment. [The plaintiff] alleges only that the strains and sprains requiring the medication ultimately resulting in death occurred during the employment. She does not allege that the medical treatment itself arose out of and in the course of employment." (*Szydlowski v. General Motors*

*Corp.* (1975), 59 Mich. App. 180, 183, 229 N.W.2d 365, 367.)

The victim is not necessarily out of luck if the aggravation happens to be caused by the original employer or another employee.

The majority opinion tries to present *Duprey* as a freak, given little credence even in California. Quite the contrary, California courts have recently reaffirmed it (*D'Angona v. County of Los Angeles* (1980), 27 Cal. 3d 661, 613 P.2d 238, 166 Cal. Rptr. 177), applied it to sustain a malpractice action against a company doctor who negligently treated an industrial injury, as in the present case (*Hoffman v. Rogers* (1972), 22 Cal. App. 3d 655, 99 Cal. Rptr. 455), and extended the doctrine to the product liability context (*Douglas v. E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 137 Cal. Rptr. 797). In *D'Angona* the California Supreme Court disposed of *Deauville v. Hall* (1961), 188 Cal. App. 2d 535, 10 Cal. Rptr. 511, on which the majority opinion relies, by stating that *Deauville* involved a fundamentally different situation, in which the employee was trying to hold the employer liable for the aggravation of an injury by an outside physician to whom the employee was referred—not by an in-house doctor:

> "Larson recognizes the difference \*\*\*, stating that there is a 'crucial difference' between 'Paying for services and physically performing them' because it is 'virtually impossible to cause physical injury by writing a check' but 'very possible' to do so by 'administering medical treatment . . . .' " (*D'Angona v. County of Los Angeles* (1980), 27 Cal. 3d 661, 668, 613 P.2d 238, 243, 166 Cal. Rptr. 177, 182.)

*Duprey,* moreover, was not a narrowly written opinion; much of the language applies to this case. For example:

> " 'That independent professions by the fact of business contact with the employer should be absolved of responsibility for mistake, avoidable or

unjustified neglect resulting in secondary affliction, seems obnoxious to the purpose and spirit of such a statute. To so hold might induce industry to encourage quackery, and place a premium upon negligence, inefficiency and wanton disregard of the professional obligations of medical departments of industry, toward the artisan.' " 39 Cal. 2d 781, 791, 249 P.2d 8, 14.

This court, in adopting the idea of dual capacity in *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, cited *Duprey* as one of the leading cases on the subject. Employer liability for medical malpractice, as in *Duprey*, has been recognized in Ohio (*Guy v. Arthur H. Thomas Co.* (1978), 55 Ohio St. 2d 183, 378 N.E.2d 488), Michigan (*Szydlowski v. General Motors Corp.* (1975), 59 Mich. App. 180, 229 N.W.2d 365), New York (*Garcia v. Iserson* (1974), 33 N.Y.2d 421, 353 N.Y.S.2d 955; *Volk v. City of New York* (1940), 284 N.Y. 279, 30 N.E.2d 596), and Montana (*Vesel v. Jardine Mining Co.* (1940), 110 Mont. 82, 100 P.2d 75). Pennsylvania (*Tropiano v. Travelers Insurance Co.* (1974), 455 Pa. 360, 319 A.2d 426) and New Jersey (*Mager v. United Hospitals* (1965), 88 N.J. Super. 421, 212 A.2d 664, *adopted by supreme court* (1966), 46 N.J. 398, 217 A.2d 325) have held the employer's compensation insurance carrier liable for the malpractice of its doctors on reasoning that would apply equally to the employer. The majority's Mississippi authority (*Trotter v. Litton Systems, Inc.* (Miss. 1979), 370 So. 2d 244) amounts to a flat rejection of the idea of dual capacity; it is grounded in the notion that if the employer is liable for compensation he cannot also be liable in tort. This court, even before *Smith*, rejected the position *Trotter* advances. In *Laffoon v. Bell & Zoller Coal Co.* (1976), 65 Ill. 2d 437, this court held that a general contractor who hired a subcontractor without compensation insurance might be liable both for compensation and

in tort.

The reasoning of *Laffoon* was that a victim should not be denied tort recovery because of merely fortuitous circumstances. That is the same idea that underlies the dual-capacity doctrine, as is clear from *Smith,* which relied on *Laffoon.* A victim should not be barred because the "third party" tortfeasor happened to be the employer. *Laffoon,* as its dissent points out, went beyond most States in allowing tort recovery. That same dislike for fortuitous bars to tort recovery led this court, even earlier, to hold unconstitutional a version of the Workmen's Compensation Act that denied recovery from anyone who was an employer under the Act, even if not the victim's employer. (*Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179.) I would therefore not have expected this court to exhibit hostility to the dual-capacity idea.

There is nothing unfair in the employee having the protection of both the compensation system and the tort law, for he could have had both by going to an independent doctor, as the legislature has determined he was entitled to do. The doctor would have been liable in a tort action for any malpractice he committed; and his fee, which the employer would have had to pay, would naturally have reflected that fact. In effect, the employer would have had to bear some share of the cost of the independent physician's malpractice insurance. The employer would still have had to pay compensation for any aggravation, whatever the cause. If the aggravation were tortious, the employer could get back its money from the doctor; but otherwise, the employer would bear that cost as well.

Under the workers' compensation system, in return for the loss of his right to sue for his initial injuries, McCormick got no-fault, though limited, protection against such industrial accidents. What did McCormick get for going to the Caterpillar clinic and thereby, under the decision in this case, giving up his malpractice claim? Not no-fault

protection—he already had that. He received nothing. That is the kind of arrangement this court struck down in *Grasse*:

> "[T]he classification of injured employees *** is arbitrary and in no way promotes any of the objectives of the act. *** Those injured by third party tort-feasors bound by the act are not entitled to common-law damages from such persons, whereas those injured by third party tort-feasors not bound by the act are allowed to institute actions for damages. Both classes of injured employees may be entitled to compensation from their own employers, so that the amount of compensation, if any, received by the injured employee is not the basis for differentiation between the classes. ***
>
>                * * *
>
> ***[T]he fact that the third party tort-feasor may have to pay his own employees compensation or is entitled to compensation himself, does not justify denying the injured employee recovery against such tortfeasor." (412 Ill. 179, 195-97.)

Common law rights of action should not be deemed taken away except when something of value has been put in their place. 2A A. Larson, Workmen's Compensation sec. 65.10 (1976).

The only possible advantage McCormick got by going to the clinic was convenience. But convenience is not enough to make an injury work related and bar tort recovery. In *Tipple v. High Street Hotel Co.* (1941), 70 Ohio App. 397, 41 N.E.2d 879, the plaintiff worked for a hotel, running a cigar stand. She often ate in the hotel restaurant nearby, so that she could keep an eye on the cigar stand and run back when customers appeared. She also got a substantial discount at the restaurant, as an employee. Nevertheless, when she got sick on the food, she was allowed to sue in tort. The court emphasized that

while she found it convenient to eat at her employer's establishment she was not required to do so; it helped her do her job, but it was not part of her job.

Why should Caterpillar be able to shield itself and its doctors from liability by paying them a salary instead of a fee? As the United States Supreme Court said:

"Pan-Atlantic has not pointed and could not point to any economic difference between giving relief in this case, where the owner acted as his own stevedore, and in one in which the owner hires an independent company. *** Petitioner's need for protection from unseaworthiness was neither more nor less than that of a longshoreman working for a stevedoring company. As we said in a slightly different factual context, 'All were subjected to the same danger. All were entitled to like treatment under law.' " *Reed v. The Yaka* (1963), 373 U.S. 410, 414-15, 10 L. Ed. 2d 448, 452-53, 83 S. Ct. 1349, 1352-53.

McCormick's waiver of his tort rights by going to the Caterpillar clinic is especially unfair because there was nothing to warn him of the legal effect of his apparently innocuous choice of doctors. He did not understand what he was giving up for the convenience of a doctor on the work premises. Patients and doctors have deeply rooted expectations about their roles in our system of medical care and the legal aspects of their relation. The law, for example by according a physician-patient privilege, recognizes the relation as unusually important and gives it special protection. Doctors are professionals, who encourage patients to have trust and confidence in them; if the doctor blunders or is disloyal, the doctor and not the patient will pay, at least in money. If a private doctor attempted to disclaim liability for malpractice, the law would take a hard look at that agreement. Yet the majority decision holds that that is what the patient will get as

part of his "implied contract" of workers' compensation (*Keller v. Industrial Com.* (1932), 350 Ill. 390, 397) if he is so naive as to rely on his employer's clinic, even though that arrangement is contrary to the patient's reasonable expectations, and normally disfavored by the law.

To regard the aggravation by malpractice of McCormick's injury as an industrial accident, for which workers' compensation is the exclusive remedy, does not fit in with the purpose and theory of the Workers' Compensation Act. Workmen's compensation laws were enacted because the common law defenses of contributory negligence, assumption of risk, and the fellow-servant doctrine made tort recovery for industrial accidents extremely difficult; only about 20% of injured workers recovered. (Note, *Dual Capacity Doctrine: Third-Party Liability of Employer--Manufacturer in Products Liability Litigation,* 12 Ind. L. Rev. 553 (1979).) "The evil to be remedied *** was that under the common-law rules of master-servant liability, employees injured in the course of their employment had to bear practically the full measure of their loss, hence a substitute system of liability was provided." (*Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179, 195.) The theory of workmen's compensation was that industrial accidents were not to be considered anyone's fault in particular; fault was not to be disputed; rather, accidents were an inherent risk of employment. The great producing cause of injury was regarded as the industry itself, and the industry, not the worker, was to bear the cost like any other cost of production. *Ross v. Erickson Construction Co.* (1916), 89 Wash. 634, 639, 155 P. 153, 156; see *O'Brien v. Rautenbush* (1956), 10 Ill. 2d 167, 173-74.

At least in this State, none of the three classical defenses to employees' tort claims at common law would have hindered people in McCormick's position. The fellow-servant doctrine would not have barred recovery,

for it applied only to those employees cooperating on a particular project or whose habitual association allowed them influence over one another. (*Aldrich v. Illinois Central R.R. Co.* (1909), 241 Ill. 402.) The Caterpillar doctors would not have been regarded as fellow servants of McCormick. Similarly, a worker assumed only the natural and ordinary risks incident to the business (*Western Stone Co. v. Whalen* (1894), 151 Ill. 472, 484), that is, those risks he must have contemplated and accepted in taking the job. Negligent medical treatment was not one of those. And while workers may often get careless on the job and contribute to their initial injuries, there is no reason to believe that the victims of industrial accidents are more likely than other patients to be contributorily negligent in their medical care. Industrial medical malpractice is just like any other medical malpractice, with none of the special problems that led the legislature to a special solution for industrial accidents.

Medical malpractice is not an inherent risk of the tractor business, or of whatever line of work McCormick was in when first injured. It is a feature of medical practice, and its costs should be borne by the medical profession, an ancient and distinct one. The legislature has not seen fit to pass a Patients' Compensation Act. This court should not, in effect, provide the practitioners of one medical specialty, industrial medicine, with a no-fault malpractice scheme. The Workers' Compensation Act is not, and was not intended to be, a complete system of social insurance. When an employee is hired, he assumes the hazards and risks of employment that naturally flow from that employment. The risks he accepts should not be extended to those not really incident to the employment, like the risk of medical mistreatment. See *Douglas v. E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 111-12, 137 Cal. Rptr. 797, 801-02.

I recognize that in some instances the aggravation it-

self, as well as the initial injury, is sufficiently within the employment context that workers' compensation is the exclusive remedy. But, for the reasons stated above, we should not, as the majority does, routinely sweep into the compensation system all aggravations of industrial accidents by the negligence of the in-house medical staff.

The essential issue here is whether McCormick and Caterpillar stepped outside their employment relation and entered a new relation, a new status, namely that of doctor (or doctor's employer) and patient, assuming corresponding new rights and responsibilities. I believe the issue is essentially one of social reality: How did the participants and those around them perceive what they were doing? What expectations would ordinary people in those circumstances have? How does it strike us now? Is this a case of a tenacious lawyer dredging up some unrealistic legal theory to enable his client, the employee, to evade the compensation limits for an accident that everyone can plainly see arose out of and in the course of employment? Or do we have a company desperately shoving out of sight the hat it was sporting when the malpractice occurred, and grabbing for the helmet labeled "employer"? In the phrase "company doctor," which word is more significant?

As the California courts have put it:

"It is true that the law is opposed to the creation of a dual personality, where to do so is unrealistic and purely legalistic. But where, as here, it is perfectly apparent that the person involved—Dr. Shane—bore towards his employee two relationships—that of employer and that of doctor—there should be no hesitancy in recognizing this fact as a fact. Such a conclusion, in this case, is in precise accord with the facts and is realistic and not legalistic." *Duprey v. Shane* (1952), 39 Cal. 2d 781, 793, 249 P.2d 8, 15.

"Our society is pluralistic. The same person

(real or artificial) from time to time obviously adopts many *roles* in relationship with others. Our law is replete with these many different roles.
\*\*\*

This is not a legalistic machination; nor is it 'conjuring a nonemployer doppelganger' out of the manufacturer's activity. There is nothing ghostly or fictional about two capacities. \*\*\* Which combination of jural opposites or jural correlatives apply is dependent in the specific role assumed at the particular *time* involved. While it may be that a defendant cannot *simultaneously* be two distinct entities, a defendant can act in two distinct capacities *sequentially.*" *Douglas v. E. & J. Gallo Winery* (1977), 69 Cal. App. 3d 103, 110-11, 137 Cal. Rptr. 797, 801.

In the average medical-aggravation case, dual capacity is appropriate because of the thick mystique surrounding the roles of doctor and patient. There is no more distinct calling than that of the doctor (*Aetna Life Insurance Co. v. Watts* (1931), 148 Okla. 28, 35, 296 P. 977, 984); professional responsibility has ancient roots, much like the warranty of seaworthiness (*Reed v. The Yaka* (1963), 373 U.S. 410, 10 L. Ed. 2d 448, 83 S. Ct. 1349). Patients tend to look upon themselves, and to be looked on, temporarily, as patients, whatever else they may be out of the medical setting. Presidents and Caterpillar employees both obey doctors' orders.

There is one feature of this case, however, which, as Caterpillar stresses, makes this case less appropriate for the dual-capacity doctrine than, for example, *Duprey v. Shane.* The main difference between this case and *Duprey* is that the Caterpillar clinic served only employees, not the public. The clinic did not limit itself entirely to the treatment of work-related injuries; but, still, the atmosphere of a clinic for employees must be more employment per-

meated than the office of Dr. Shane, who gave his employee-patient the same service he would have offered anyone who walked in. Playing a role for the public gives it greater distinctness and defining power, and makes the fact that employees are involved seem more fortuitous. But, the importance of this factor is debatable; the New York Court of Appeals, for example, changed positions on the issue, first deciding that an employee could recover for malpractice in a facility limited to employees (*Volk v. City of New York* (1940), 284 N.Y. 279, 30 N.E.2d 596), then overruling that case and holding that only public practice creates a dual capacity (*Garcia v. Iserson* (1974), 33 N.Y.2d 421, 353 N.Y.S.2d 955).

I do not see sufficient reason to limit application of the dual-capacity doctrine to public medical practice. I do not understand why a standard role that the defendant plays in fact only for insiders should not also give rise to tort liability. See *Hoffman v. Rogers* (1972), 22 Cal. App. 3d 655, 99 Cal. Rptr. 455; *Szydlowski v. General Motors Corp.* (1975), 59 Mich. App. 180, 229 N.W.2d 365; *Tropiano v. Travelers Insurance Co.* (1974), 455 Pa. 360, 319 A.2d 426; *Mager v. United Hospitals* (1965), 88 N.J. Super. 421, 212 A.2d 664, *adopted by supreme court* (1966), 46 N.J. 398, 217 A.2d 325; *Vesel v. Jardine Mining Co.* (1940), 110 Mont. 82, 100 P.2d 75—all cases in which employers, their insurers, or their doctors have been held liable for malpractice in a facility provided only for employees.

In *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, this court held the defendant partner liable in a dual capacity as lessor of a defective product, although there was no indication it ever leased anything to anyone but the partnership. Certainly, the lease was no arm's length deal: the partnership got a substantial discount off the going price for such items. What was significant in that case was that the partners, by their arrangement, indicated

that they *meant* to separate the lease from the venture as a whole, the partner from the partnership; in their own minds and contracts, the lease was real.

There is no reason why the public character of a role should be more important in malpractice cases than in product liability cases, that is, cases where an employee sues his employer on the theory that the employer not only furnished the employee the machine or whatever that injured him, but actually produced, sold, or leased it, and is therefore strictly liable in tort, in a dual capacity, for the defects of the product. If anything, public sales of the product should be regarded as more essential in products cases than public practice is in medical malpractice cases. In a products case, the injury, an element of the tort, occurs directly in the employment context; there is no second injury as in a malpractice case. Thus, if employees can recover from their employers on product liability claims even when there is no product distribution to the public at large, the liability, for negligent treatment, of an employer who provides medical services only for his employees becomes clearer.

Similarly, in *Reed v. The Yaka* (1963), 373 U.S. 410, 10 L. Ed. 2d 448, 83 S. Ct. 1349, another classic case for dual capacity, reaffirmed in *Jackson v. Lykes Brothers Steamship Co.* (1967), 386 U.S. 731, 18 L. Ed. 2d 488, 87 S. Ct. 1419, the court held a bareboat charterer liable on the warranty of seaworthiness to a longshoreman it employed directly instead of using a stevedoring company as was usual. There was no indication that anyone but employees worked on or near the vessel or could in fact be at risk from the unseaworthiness. It was enough that in legal principle the warranty did not depend on the employment but ran to all alike. The same can be said of the obligations of doctors.

In the present case, the different people involved had conflicting expectations. Caterpillar may well have felt

that it was merely discharging its duties as employer as best it could. McCormick probably felt like a patient rather than an employee. If someone had asked what he was doing at the clinic, neither McCormick nor anyone else would have said, "working." The doctors probably felt like doctors: they did not go to school all those years to become Caterpillar employees, and when strangers ask them what they do they probably do not say they are employees of Caterpillar. Since Caterpillar was not personally there, and can justly be held responsible for the image projected by its doctors, its view is less important than that of the other participants. On the whole, I believe the activities of the clinic are more aptly described as medicine than as employment, and would be so perceived by an observer on the spot.

Sound reasoning and the bulk of authority, both from this State and other jurisdictions, favor allowing the tort action McCormick sought to bring against his employer. I find this a stronger case for dual capacity than *Smith*. The majority ruling in this case seems to me a retreat from *Smith*. I would affirm the appellate court rather than retreat from *Smith,* and allow the suit to proceed.