Karl L. POMER and Claire L. Pomer,
Plaintiffs–Appellants,

v.

Dennis SCHOOLMAN and James King,
Defendants–Appellees,
Counterplaintiffs–Appellants,

v.

DEERE & COMPANY, Defendant,
Counterdefendant–Appellee.

Nos. 88–1794, 88–1872.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1989.

Decided May 12, 1989.

Charles Locker, Chicago, Ill., for plaintiffs-appellants.

Richard F. Record, Jr., Craig & Craig, Mattoon, Ill., Hurshal C. Tummelson, Phebus Tummelson Bryan & Knox, Urbana, Ill., for defendants-appellees, counterplaintiffs-appellants.

Before WOOD, Jr., POSNER and MANION, Circuit Judges.

POSNER, Circuit Judge.

A gruesome accident on an Illinois farm in 1983 has produced an appeal which brings before us the fellow-servant rule—a nineteenth-century tort doctrine long ago consigned, one might have thought, to the dustbin of history. The appellants, who were the plaintiffs in the district court, are Karl Pomer and his wife (the latter claiming loss of consortium). The defendants are Dennis Schoolman, an Illinois farmer who hired Pomer to drive a truck; James King, a fellow employee of Pomer's, who drives a combine for Schoolman; and Deere & Company, the manufacturer both of the combine and of the attachment to it that injured Pomer. At the end of the liability phase of the trial, the district judge directed a verdict for Schoolman. The jury then brought in verdicts for the remaining

defendants. The Pomers appeal on a variety of grounds. Schoolman and King have filed a conditional cross-appeal against Deere, arguing that if we send the case back for a new trial, the issue of contribution among joint tortfeasors should be submitted to the jury under a different form of verdict. However, on the view we take of the Pomers' appeal, the cross-appeal is moot.

At the time of the accident Karl Pomer was in his late thirties, an experienced truck driver with, however, little experience around farms. Schoolman had hired Pomer in September to drive a semi-trailer truck that hauls grain to Schoolman's grain elevator. The corn harvest began a month later and the accident occurred on the second day of the harvest, Pomer having been elsewhere the first day. King was harvesting the corn with a Deere combine to which a Deere corn head (i.e., corn picker) was attached. Deere's largest corn head, it has eight rows—large steel points that protrude from the front of the head. (See the photograph of the corn head, at the end of this opinion.) Beneath the rows are gathering chains. The corn head is attached to the front of the combine, and as the combine moves forward, the gathering chains pull the corn into the head, where it is shucked. An auger (a large rotating screw) at the back of the head conveys the shucked corn into the combine, where it is deposited behind the driver, who sits in a cab high up on the combine. A separate auger, in the combine itself, drives the corn up a chute in the back of the combine so that it can be loaded into a truck.

King had stopped the combine beside Pomer's parked truck to load the truck. The loading is done by the combine operator, who guides the chute in the back of the combine over the open bins of the truck. While loading the truck King was looking over his shoulder at the chute and the truck, rather than forward. The combine was stationary. (There was some evidence, but the jury was entitled to and apparently did disbelieve it, that the combine might have "crept" forward accidentally.) However, the corn head had not been turned off. This was standard operating proce-

dure, because if a corn head is turned off before all the corn in it has been shucked, the machinery may foul. The corn head makes a great deal of noise when it is turned on, and its rows, which at the time in question were probably about six inches above the ground, are clearly visible; the ground moreover was clear, the corn having been stripped off by the corn head.

Pomer left the cab of the truck and walked around to the back to watch the corn being loaded from the combine into the truck's bins. He was standing next to the corn head with his head craned upward in an effort to see whether the bins of his truck were filling up, and the next thing he knew he was in the corn head. The only plausible explanation of what happened is that, while standing in an awkward position looking upward at the truck, Pomer took a step to the side (perhaps to regain balance), which brought his foot under the left-most row of the corn head, where he was caught by the chains underneath, jerking him into the machine. King quickly placed the auger in the corn head in reverse to save Pomer, and the corn head "spit him out," but not before it had mangled his legs. Both legs were later amputated (whether above or below the knees, the record does not reveal). Pomer was still conscious when rescuers from the volunteer fire department arrived on the scene. He told one of them *not to blame Jim King; he (Pomer) had just taken one step too many, it was all his fault,* and he was going to be a vegetable. He told another "it was my fault, my fault."

Illinois citizens at the time of the accident, Pomer and his wife later moved to Michigan and were therefore able to bring this suit as a diversity suit in federal court. Count I of the complaint charged Schoolman (the employer) and King (Pomer's fellow employee) with liability for negligence by King in the operation of the combine, the alleged negligence consisting primarily of King's failing to turn off the corn head before loading the corn into the truck and failing to maintain a careful lookout for Pomer. Count II asked for punitive damages against Schoolman and King. The

grounds were that King, who was 20 years old when the accident occurred, "was possessed of an immature and reckless nanture [*sic*], ill suited to the operation of such mechanical devices as a combine"; that Schoolman had failed to train King in the safe operation of the combine and head; and that the machinery had been improperly maintained. Another count charged Deere with negligent design of the combine and corn head because they lacked safety devices that would have prevented the accident, for example an interlock device that would have prevented the cutting and shucking knives of the corn head from operating while its auger was loading the corn into the combine. The complaint alleged, alternatively, that Deere had sold a defective product, the defect consisting precisely in the absence of the suggested safety features; and here damages were sought on a theory of strict products liability.

The case was tried to a jury. After the parties had finished presenting all their evidence, the judge ruled that the plaintiffs had failed to present any evidence to support Count II, the claim for punitive damages. That meant, the judge continued, that the only possible basis for holding Schoolman liable for the accident was the doctrine of respondeat superior, Schoolman being King's employer. But King was a fellow servant of Pomer, and the fellow servant rule prevents a plaintiff from imputing the negligence of a fellow servant to their common employer. Hence there was no basis for holding Schoolman liable and he was entitled to a directed verdict. The plaintiffs then sought leave to file an amended complaint that would add a count charging Schoolman with negligence directly, in entrusting a dangerous instrumentality to the allegedly immature and untrained King. The judge refused to allow the amendment but added that the instructions would place the issue of Schoolman's negligence before the jury. The case then went to the jury against defendants King and Deere, but as we have noted the jury brought in verdicts for both of these defendants. So the Pomers lost their entire case.

The Pomers challenge, to begin with, the instructions under which their case against Deere went to the jury. They say the instructions confused strict liability with negligence and implied that if Karl Pomer was contributorily negligent (as undoubtedly he was) this was a complete defense, whereas in fact it would merely reduce the amount of the damages. Illinois has since changed its law of comparative negligence to make the plaintiff's contributory negligence a complete defense if that negligence is more than 50 percent responsible for his injury. See Ill.Rev.Stat. ch. 110, ¶¶ 2–1107.1, 2–1116; *Wassell v. Adams*, 865 F.2d 849, 852 (7th Cir.1989). That change in the law undoubtedly would sink the Pomers, but is not applicable to this suit, which preceded the change. Although susceptible of the misreading that concerns the plaintiffs, the instructions do not state the law incorrectly and are not so confusing as to warrant reversal.

The more significant challenge mounted by the plaintiffs concerns the dismissal of Schoolman at the close of the evidence. The dismissal *may*, as they argue, have doomed their case against King—and since their case against Deere was a weak one, doomed their case, period. For here were the employer and the employee on trial, and just before retiring to deliberate the jury was informed that the employer was no longer a defendant. Was the jury likely to bring in a verdict against a young farm worker when his employer had just been dismissed from the case? Perhaps so—if the jury had thought King negligent, which apparently it did not and for very good reasons as we shall see. And usually we assume that the jury obeys the judge's instructions. Nor are we confident that the jury would have regarded Schoolman as a "deep pocket" defendant, such that with him out of the case it was reluctant to return a verdict for the plaintiff. The jury exonerated the only deep-pocket defendant in the case, Deere & Company.

The invocation of the fellow-servant rule (the basis on which Schoolman was dismissed from the case) in a trial conducted in the waning years of the twentieth centu-

ry invites comment. Before the advent of workmen's compensation, industrial accident cases—that is, cases in which an employee sued his employer for an injury sustained on the job—were governed by general principles of tort law, supplemented however by special doctrines thought appropriate to the employment relation. Foremost among these was the fellow-servant rule, under which a plaintiff injured by a co-worker's negligence could not impute that negligence to their common employer under the doctrine of respondeat superior, as he could have done had he been injured by the employee of a "stranger," which is to say of someone with whom the victim had no preexisting relationship. The rationale for the fellow-servant rule, as articulated by Chief Justice Lemuel Shaw in the opinion that established the doctrine in American common law, *Farwell v. Boston & Worcester R.R.*, 45 Mass. (4 Met.) 49 (1842), was a dual one. First, the relationship between employer and employee is contractual. If a warranty against injury caused by a careless fellow worker would be mutually beneficial, the parties could be expected to negotiate one voluntarily; in the absence of an express warranty the presumption was that the employer had raised the employee's pay to compensate the employee for the added risk of an uncompensated injury. An early Illinois case expressed this rationale clearly: "each servant, when he engages in a particular service, calculates the hazards incident to it, and contracts accordingly. This we see every day —dangerous service generally receiving higher compensation than a service unattended with danger or any considerable risk of life or limb." *Illinois Central R.R. v. Cox*, 21 Ill. 20, 26 (1858).

Second, the knowledge that an injury by a careless fellow worker would not be redressed out of their employer's deep pocket would give workers an added incentive to monitor each other's care and report a careless worker to the employer. For once the employer was on notice that a worker was careless, the employer would himself be deemed careless, and would therefore be liable for negligence directly rather than derivatively, if he failed to discipline or fire the worker or otherwise prevent him from injuring other workers. The fellow-servant rule was a defense merely against imputed or derivative liability, not against the employer's own negligence. It was not a defense of any kind for the careless fellow worker, if he were sued; but ordinarily he was judgment-proof.

Chief Justice Shaw's analysis, though an undoubted *tour de force* of legal-economic reasoning, has been questioned as resting on artificial premises concerning the information available to workers about the hazards of the workplace and the practical ability of workers to monitor each other, especially when they worked in different departments of the employer's business. For Chief Justice Shaw had refused to confine the fellow-servant rule to workers in the same department, mainly on the ground that this would complicate the rule unduly. This refusal compromised the second rationale for the fellow-servant rule; and some nineteenth-century courts—including the Supreme Court of Illinois, which had adopted the fellow-servant rule shortly after *Farwell* (see *Honner v. Illinois Central R.R.*, 15 Ill. 550 (1854))—declined to follow *Farwell* all the way, and confined the fellow-servant rule to workers in the same department. See, e.g., *Toledo, Wabash & Western Ry. Co. v. O'Connor*, 77 Ill. 391, 396–97 (1875). By doing so, the Illinois court compromised the first rationale of the rule (involving freedom of contract and the presumption of a compensating wage differential), which is independent of the proximity in which the fellow servants work, even though the court had adopted that rationale in its earlier decision in *Illinois Central R.R. v. Cox*, as we have seen.

The controversy over the justice, rationale, consequences, and scope of the fellow-servant rule became largely academic with the passage of workmen's compensation laws, which made the employer's liability strict and abolished the fellow-servant rule, see, e.g., Workers' Compensation Act, Ill.Rev.Stat. ch. 48, ¶¶ 138.1 *et seq.; McCormick v. Caterpillar Tractor Co.*, 85 Ill.2d 352, 53 Ill.Dec. 207, 423 N.E.2d 876 (1981),

and with amendments to the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, which abolished the fellow-servant rule with respect to railroads, the major industry exempted from workmen's compensation. Later, maritime workers were also placed under this regime, by the Jones Act, 46 U.S.C. § 688, which is modeled on the FELA.

The common law of industrial accidents did not die completely. Some industries were exempt from workmen's compensation yet not subject to an alternative statutory regime. Farming is today the principal such industry. See Ill.Rev.Stat. ch. 48, ¶ 138.3(19). Schoolman, the employer-defendant in our case, was not required to be covered by the Illinois Workers' Compensation Act; he remained subject to common law tort liability for an employment-related injury to his employee Pomer. And Illinois has never, by statute or common law ruling, abolished the fellow-servant rule, which we find being treated as a living doctrine in a case decided as recently as 1972. See *Burnett v. Caho*, 7 Ill.App.3d 266, 276–77, 285 N.E.2d 619, 627 (1972). Nor do the Pomers argue that we should anticipate that if the Illinois Supreme Court were presented with a case today involving the issue of the continued vitality of the fellow-servant rule it would abolish the rule and make the employer liable for the negligent injury of one of his employees by another. They urge us to interpret the rule narrowly because it is disfavored by most modern authorities, but they do not suggest that we ignore it.

■ They do argue that Pomer and King were not fellow servants, because although employed by the same employer they were not working together or doing the same job. The safety-monitoring rationale of the fellow-servant rule does require that the fellow servants work in sufficiently close proximity that they can feasibly monitor each other's care; and, as actually applied, Illinois' "same department" gloss on the fellow-servant rule requires the court to make a factual determination as to whether the alleged fellow servants were required by the duties of their employment to work in cooperation with each other so that they could actually monitor each other's safety. See, e.g., *Bennett v. Chicago City Ry.*, 243 Ill. 420, 428–32, 90 N.E. 735, 737 (1909); *Indiana, Illinois & Iowa R.R. v. Otstot*, 113 Ill.App. 37, 46–47 (1903). A modern court that did not abolish the fellow-servant rule outright would probably construe it very narrowly, perhaps so narrowly that a truck driver and a combine driver would not be considered fellow servants. For as a practical matter Pomer had little basis for determining whether King was operating the combine in a safe fashion, especially since this was Pomer's first day harvesting corn. The rationale of Illinois' "same department" gloss would therefore argue for placing King and Pomer in different departments despite the physical proximity in which they worked.

■ But even if the fellow-servant rule is inapplicable, this would not carry the day for the Pomers. The jury found that King was not negligent, so there was no negligence to impute to his employer, Schoolman. The plaintiffs respond, as we have noted, that the dismissal of Schoolman from the case made it unlikely that the jury would return a verdict for the Pomers even if it thought that King had been negligent. For reasons stated earlier, we are not so sure. In any event we are obliged to assume, in the absence of compelling contrary indications, that a jury obeys its instructions—otherwise jury trials would not be a workable method of dispute resolution—and this jury was instructed to bring in a verdict for the Pomers against King if it found that King was negligent.

■ Anyway, there is no evidence that King *was* negligent. He could hardly be faulted for failing to keep a sharp lookout for Pomer. Not only did King's job require him to turn around and watch the loading of the corn into the truck to make sure the combine's chute dropped the corn into the bins of the truck and not onto the ground; King had no reason to think that Pomer— that any adult—would approach within range of an operating corn head. When turned on, a corn head is manifestly dan-

gerous, loud, and clearly visible. Even when turned off, its appearance is sinister (see photograph); to see it in operation is to want to avoid getting close to it. (The jury was taken to watch a corn head in operation.) And nothing in Pomer's job, which was merely to drive the truck, required him to approach the corn head.

■ A person cannot be deemed negligent for failing to take precautions against an accident that potential victims could avoid by the exercise of elementary care; negligence is failing to take the care necessary and proper to prevent injury to reasonably careful persons. See, e.g., *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1557–58 (7th Cir.1987) (interpreting Illinois common law); *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1265 (7th Cir.1986) (same); *Hession v. Liberty Asphalt Products, Inc.*, 93 Ill.App.2d 65, 74, 235 N.E.2d 17, 22 (1968). Correlatively, there is no duty to warn against an obvious danger, for an obvious danger is no danger to a reasonably careful person. See, e.g., *Stone v. Guthrie,* 14 Ill.App.2d 137, 148–51, 144 N.E.2d 165, 170–71 (1957); *Wassell v. Adams, supra,* 865 F.2d at 855 (applying Illinois law). At the oral argument of this appeal the Pomers' own counsel described the danger facing Pomer as obvious.

■ Nor was King negligent—more precisely, a rational jury could not have found that King was negligent—in failing to turn off the corn head before he started loading the corn from the combine into the truck. Not only would doing so have created a risk of fouling the moving parts of the corn head, but it would have seemed a totally unnecessary precaution, since Pomer could not be expected to walk into a corn head that was turned on. Nothing invited, let alone required, Pomer to stand right next to the rows of teeth; nothing, indeed, required him to leave the truck. There was no evidence that accidents such as these are common, or indeed that such an accident had ever occurred before. When Pomer told his rescuers that the accident was his fault and that King should not be blamed, he was speaking the literal truth. The point is not that Pomer's contributory negligence is a complete defense to a charge of negligence against King; it is not. The point is that Pomer's negligence is the only negligence in the picture, and was the sole culpable cause of the accident.

■ Since Schoolman's liability under Count I of the complaint depended on King's being found negligent, and since the judge properly dismissed Count II because the plaintiffs had failed to prove that Schoolman or King had behaved with such recklessness as might warrant an award of punitive damages, the only way the plaintiffs could have retained Schoolman in the case would have been if the judge had allowed the Pomers to amend their complaint to charge Schoolman with negligent entrustment of the combine and corn head to King. The close of the evidence is awfully late in a lawsuit to move for an amendment to the complaint, unless the purpose is merely to conform the pleadings to the evidence; such an amendment is not untimely even if sought after judgment. See Fed.R.Civ.P. 15(b). But that, the plaintiffs argue, *was* the purpose of the amendment. The theory of negligent entrustment had been raised in Count II, the punitive-damages count. Even if the Pomers had failed to present evidence warranting an award of punitive damages, they might have presented evidence warranting an award of compensatory damages for negligence in entrusting a dangerous piece of machinery to an (allegedly) immature and untrained employee. To such a charge, the fellow-servant rule would be no defense. See, e.g., *Metropolitan West Side Elevated Ry. v. Fortin,* 203 Ill. 454, 67 N.E. 977 (1903).

■ The judge gave an inadequate explanation for refusing to allow the amendment to the complaint: that the evidence of negligent entrustment by Schoolman would be considered by the jury anyway, under the instructions on negligence. It is true that evidence of King's inadequacies, an essential strut of the negligent-entrustment theory, was before the jury as part of the plaintiffs' case *against King.* But the fact that evidence is admissible against two defendants is obviously no ground for dis-

missing one of the defendants from the case. Nevertheless the judge was right—indeed was compelled—to refuse to allow the amendment. For there was no evidence of negligent entrustment—no evidence that Schoolman had failed to exercise due care in hiring King; no evidence that Schoolman had failed to give King adequate instruction in how to operate a combine and corn head; no evidence that King, an experienced combine operator who had gone to a John Deere Harvester School for training in the operation of Deere farm machinery, was immature or reckless; no evidence that he had ever had an accident while operating farm machinery; no evidence, in short, of any negligence by Schoolman.

From what we have said it should be plain that the district judge did not commit reversible error in refusing to withdraw from the jury another common law fossil: the defense of assumption of risk. At common law a worker was deemed to have assumed the risks of his employment, provided they were apparent; if one of the risks materialized and he was injured, it was his tough luck. See, e.g., *Wheeler v. Chicago & W.I.R. Co.*, 267 Ill. 306, 317, 108 N.E. 330, 336 (1915). Like the closely related fellow-servant defense—one ground of which was that the worker assumed the risk of being injured by a negligent fellow worker and was compensated for assuming it by receiving a higher wage—assumption of risk was an unpopular component of the common law of industrial accidents. Workmen's compensation statutes abolished it, as did the FELA and the Jones Act. The Pomers, however, do not argue that Illinois has or would abolish it in the rare industrial accident case that is governed by common law principles. They do not even argue that assumption of risk is no longer a complete defense; that under comparative-negligence principles it merely reduces the damages to which the plaintiff would otherwise be entitled—though so the Illinois Supreme Court has held. *Coney v. J.L.G. Industries, Inc.*, 97 Ill.2d 104, 119, 73 Ill.Dec. 337, 344, 454 N.E.2d 197, 204 (1983); see also *Davis v. Consolidated Rail Corp., supra*, 788 F.2d at 1266. They argue only that Pomer did not assume the risk created by the corn head because the risk was not apparent to him given his lack of farm experience and the fact that the accident occurred at the outset of his participation in the corn harvest. So far as appears, he had never seen a corn head in operation. However, the jury was entitled to find that the *particular* danger that did Pomer in—the danger that if you stand next to the front of the corn head while it is busy grinding away you will come to grief if you forget where you are and take a step in the wrong direction—was obvious to Pomer notwithstanding his lack of experience. The jury saw a corn head in operation. It could draw its own conclusions. More important, as we emphasized in *Davis*, if a danger is so obvious that a reasonable person would not think a warning required—would think that anyone who might be endangered could and would protect himself—then liability is barred, irrespective of assumption of risk, by the principle that requires potential injurers to take precautions only where appropriate for the protection of normally careful and observant people, unless the injurer knows or should know that the plaintiff is not in that class.

This was a terrible accident—the consequences for Karl Pomer and his family were, on any ultimate reckoning of just deserts, grossly disproportionate to the fault implied by his momentary heedlessness. But there is no evidence that it was the fault of any of the defendants. The common law does not make an injurer the insurer of his victims. And it is up to Illinois to plug what to many observers will seem an anachronistic and even cruel gap in the state's law of industrial accidents.

The judgment is affirmed; the cross-appeal is dismissed as moot.